# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Nichols*, 2012 IL App (4th) 110519

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEMETRIUS NICHOLS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-11-0519 |
| Filed | November 27, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the aggravated battery of a corrections officer in the facility where defendant was an inmate was upheld over defendant's contentions that the trial court should have *sua sponte* ordered a fitness hearing and that his guilt was not proved beyond a reasonable doubt, since there was no *bona fide* doubt of his fitness requiring reversal, and the evidence that he struck the officer with an unknown liquid supported his conviction. |
| Decision Under Review | Appeal from the Circuit Court of Livingston County, No. 10-CF-294; the Hon. Mark A. Fellheimer, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Karen Munoz, and Allen H. Andrews, all of State Appellate Defender's Office, of Springfield, for appellant. |

Thomas J. Brown, State's Attorney, of Pontiac (Patrick Delfino, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

| Panel | JUSTICE COOK delivered the judgment of the court, with opinion.
Justices Steigmann and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1 In March 2011, a jury found defendant, Demetrius Nichols, guilty of aggravated battery. In June 2011, the trial court sentenced defendant to seven years in prison, to be served consecutively to sentences defendant was already serving.

¶ 2 Defendant appeals, arguing (1) the trial court erred by not ordering a fitness hearing on its own motion in response to allegedly incoherent and delusional statements defendant made and his treatment during these proceedings for schizophrenia and (2) the State failed to prove him guilty of aggravated battery beyond a reasonable doubt. We disagree and affirm.

¶ 3                                  I. BACKGROUND

¶ 4 In October 2010, the Livingston County grand jury indicted defendant, an inmate at Pontiac Correctional Center, with one count of aggravated battery. The indictment charged that defendant made contact of an insulting or provoking nature with a Department of Corrections (DOC) employee, corrections officer Greg E. Foltynewicz, in that he threw an unknown liquid substance upon Officer Foltynewicz, striking him upon his head and body, knowing him to be a state-employed corrections officer engaged in the performance of his authorized duties. 720 ILCS 5/12-3(a)(2), 12-4(b)(18) (West 2010).

¶ 5 Addressing defendant's fitness-hearing argument requires a detailed history of the proceedings in this case. At his January 2011 initial appearance, defendant announced his intention to represent himself. The trial court interviewed defendant to ensure that he was capable of presenting his own defense and that he understood the right to counsel that he would be giving up. Defendant accurately, it seems, reported his age, level of education, and prior experience representing himself in criminal and collateral postjudgment proceedings. The court asked defendant whether he was "currently receiving any type of medication for any medical or psychiatric condition"; defendant responded, "No. I have like asthma. I take like asthma pills. I've got the inhalers, and I take some pills." When the court asked if "it" affected his ability to talk or think in any way, defendant answered, "No, it does not."

¶ 6 Defendant and the trial court had an exchange regarding defendant's misunderstanding

that the aggravated-battery charge required the State to prove he caused the victim bodily harm. Defendant stated that aggravated battery "consists of bodily harm" and he could not be convicted "unless there's [*sic*] bruises, knife wounds." The court tried to explain that the allegation instead was that he made contact of an insulting or provoking nature with the victim. The court admonished defendant, "If you proceed as your own counsel, and you should have some doubts about that right now," "[y]ou are going to need to follow the rules of procedure and the rules of evidence in this particular state." The court further warned, "You could be convicted in an instance where you simply don't know how to proceed." Defendant stated, "I know how to proceed, Your Honor." The court eventually found that defendant knowingly and voluntarily waived his right to counsel. At the same hearing, defendant accurately corrected the State's assertion that he had previously been convicted twice of first degree murder–defendant had instead been convicted twice of *attempted* first degree murder.

¶ 7     A series of *pro se* filings that defendant now contends demonstrated his unfitness followed, beginning with a January 2011 motion to dismiss that defendant filed in court at his initial appearance. At the heart of defendant's motion to dismiss was his assertion that the State would be unable to prove he caused Officer Foltynewicz bodily harm. The motion was written in a single three-page paragraph largely made up of run-on sentences and sentence fragments interspersed with citations and references to laws both clearly relevant (*e.g.*, the statute concerning dismissal motions in criminal cases) and likely irrelevant (*e.g.*, the attempt (murder) statute and the eighth amendment to the United States Constitution) along with interjected legalese non sequiturs.

¶ 8     On February 1, 2011, defendant filed a document entitled "Illinois Evidence 429 Fifth Edition Discovery." In that document, defendant requested that the State disclose any "medical records and photographic proof of any alleged injuries" sustained by Officer Foltynewicz.

¶ 9     On February 14, 2011, the trial court held a hearing on defendant's motion to dismiss. Defendant argued the charge should be dismissed because the State was unable to show that Officer Foltynewicz was harmed and Officer Foltynewicz's credibility was "horrible." The court denied the motion. Afterward, the court allowed defendant to file during the hearing a second document entitled "Illinois Evidence 429 Fifth Edition Discovery" along with a separately handwritten duplicate of the same with the title, "Report of Investigation/Illinois Evidence 429 Fifth Edition Discovery." That document was apparently, according to defendant's in-court explanation of it, intended to serve as a discovery disclosure from defendant to the State and as evidence to be used in his trial. In the document, defendant sought to "introduce as evidence" his own allegations regarding Officer Foltynewicz's past acts that, according to defendant, affected his credibility as a witness. These allegations were unaccompanied by supporting documentation. Defendant alleged the following: (1) In April 1984, Officer Foltynewicz shot a child with a BB gun, causing the child to lose his eye. He told investigators that he had accidentally shot the child when trying to shoot blackbirds. He was arrested for reckless conduct. The document referred to the aggravated-battery statute and the reckless-conduct statute. (2) In July 1984, an Olympia Fields police officer came upon an automobile accident. The officer observed the female driver of one of the vehicles

having "blood injuries." He noticed Officer Foltynewicz "staggin [*sic*] to his view" and found beer cans, including an open can, in his car. Charges of aggravated battery were reduced to reckless conduct to prevent Officer Foltynewicz from losing his job with DOC. (3) In September 1988, when working at Menard Correctional Center, Officer Foltynewicz filed a false report alleging he had been assaulted by a prisoner. After an investigation by DOC revealed the falsehood and the prisoner pursued a civil rights claim, Officer Foltynewicz was suspended for four days and transferred to Pontiac Correctional Center. (4) In September 1984, while working as a security guard with "Armor Security Ltd. Esquire, Markham, Illinois 60426" in Chicago Heights, Officer Foltynewicz filed an injury report, alleging that he was attacked while on duty. Based on the injury report, Officer Foltynewicz collected workers' compensation benefits. A later investigation revealed that the injury report was frivolous. Officer Foltynewicz was ordered to repay the benefits, and his DOC salary was garnished for that purpose.

¶ 10    On March 29, 2011, this case proceeded to a jury trial. Prior to jury selection, the State made an oral motion *in limine* to exclude any evidence of Officer Foltynewicz's alleged prior bad acts. The State noted that he had no convictions that qualified for use in impeachment. The trial court found in the State's favor and ordered defendant not to go into his accusations during the trial.

¶ 11    The trial court then took up the matter of defendant's restraints. It ensured that defendant's restraints would not be exposed to the jury. Defendant told the court he would not mind informing the jurors that he was a prisoner. The court warned defendant that if he moved too much he would risk exposing the restraints to the jury. The court allowed defendant's right hand to be free to take notes and ensured that defendant had sufficient paper.

¶ 12    Defendant participated in *voir dire*. The record suggests that he took notes as the venire was questioned. He agreed with the State when it moved to excuse a venireperson for cause. He exercised a peremptory strike on a venireperson whom the prosecutor had represented in private practice. Defendant told prospective jurors he hoped they could give him a fair trial.

¶ 13    Defendant gave an opening statement in which he attempted to describe his version of events. He claimed that he was suffering an asthma attack and trying to get treatment for himself when he flung some water out of his cell that hit a wall. He began to explain why he "assumed [an] attitude" with Officer Foltynewicz, but the trial court interrupted and asked the jurors to disregard defendant's "last couple of comments." Defendant indicated he had no further remarks.

¶ 14    Officer Foltynewicz testified for the State. He stated he had been working as a corrections officer for about 7 1/2 years. On March 27, 2010, he was passing food trays to the prisoners in defendant's gallery. When he approached defendant's cell, defendant seemed agitated. Defendant told Officer Foltynewicz he was supposed to have been let out of segregation. Officer Foltynewicz was facing defendant. He explained that when he finished distributing food trays to the remaining prisoners in the gallery he would ask his lieutenant to verify when defendant was supposed to be released from segregation. Officer Foltynewicz was then struck in the face and chest with two cartons of an unknown liquid, which defendant had

flung through holes in his cell. Following protocol, Officer Foltynewicz informed his lieutenant of the incident, changed his clothes to clean himself, and visited the health care unit "to get checked out" and to ensure that the liquid was not toxic.

¶ 15    Defendant cross-examined Officer Foltynewicz. Officer Foltynewicz testified, in response to defendant's questioning, that he had not worked for DOC in any correctional centers other than Pontiac. He stated he had not known defendant before being assigned to his gallery at Pontiac. He testified he did not hear defendant say he was having an asthma attack and struggling to breathe at the time of the incident. The trial court sustained objections when defendant asked Officer Foltynewicz if he had ever filed a formal report before and if he was "grumpy" toward defendant on the day in question in response to something defendant had done to him. After the State's redirect examination, the court sustained objections to defendant's attempted re-cross-examination, finding it exceeded the scope of redirect. The State rested.

¶ 16    After the close of its case in chief, outside of the jury's presence, the State presented certified copies of defendant's convictions that it planned to use for impeachment if defendant decided to testify. The trial court indicated that the convictions would be admissible for impeachment. It asked defendant whether he understood its ruling. When he responded that he did not, the court explained that the evidence could be admitted for limited impeachment purposes if defendant testified, but it could not be introduced if defendant chose not to testify. When the court again asked defendant if he understood the ruling, defendant replied, "I suppose, Your Honor."

¶ 17    The trial court indicated it was considering ruling against the State on the admissibility for impeachment purposes of defendant's earlier aggravated-battery conviction. The State argued that, although it was the same in name as the crime with which defendant was charged in this case, the limiting instruction would ensure that the jury did not consider it as evidence of defendant's guilt. The court asked defendant if he had any comment or argument. The following exchange took place:

"THE DEFENDANT: It don't seem like I am getting a fair trial, Your Honor, because I didn't get a chance to introduce stuff that would have been sufficient for myself. I mean, this was like they go in the regular disciplinary committee to hear something like this, Your Honor. That is what this came off like. I didn't get a chance to tell you about what I, you know, basically the history of this guy goes back to 1982, September 14th.

THE COURT: How is that relevant, though, sir, to this incident?

THE DEFENDANT: Because you take a guy who I know personally from the street who has a young boy 13 years old to tell me to have sex with him in his damn anal.

THE COURT: All right.

THE DEFENDANT: This goes a long way. Then accused me of having sex with his wife, let alone seeing him in prison, seeing him in Menard Correctional Center, who accuse all his co-workers September 19, 1988, of beating him up and accused me and told a grand jury that I had a loaded pistol in Menard Correctional Center, that the staff, administration was allowing me to have a gun, drugs and have sex with the

administration women and the correctional officer. And so this guy telling me he only been here seven years in the Department of Corrections is not true."

The court explained that it was trying to make sure defendant received a fair trial. It ruled that the evidence of defendant's prior aggravated-battery conviction was inadmissible. Other convictions could be admitted for impeachment. The court asked defendant to consider whether he was going to testify and reiterated that the convictions could be admitted if he testified and could not if he chose not to testify. It then recessed for lunch.

¶ 18      Following the lunch recess, defendant indicated that he would not testify. He sought to introduce into evidence the previously filed February 14, 2011, document entitled "Illinois Evidence 429 Fifth Edition Discovery," in which he enumerated Officer Foltynewicz's alleged prior bad acts. When the trial court asked whether the document was relevant, defendant replied that it was relevant because "it goes towards credibility, Your Honor." He explained:

"Credibility of truth, speaking the truth, history. I mean, if you come and put on a uniform and you want the jury to believe, you know, your word against mine, and, I mean, he didn't explain no more than what the disciplinary committee said. When the State stood up, he said no more than what's written on the paper already.

\* \* \*

Because if you [are] alleging I committed a crime and yet you go in a courtroom and you ask for justice of someone help you, let alone call their house and ask their parents to bond you out. And then they help you out, and then you turn around while [their] child is going through something else, and you turn around because you angry about something totally different about your wife and about a house out in Matteson."

The court reporter stated, "I am not understanding him." The court remarked, "I will show the defendant is not making much sense here." It asked, "I guess, Mr. Nichols, one last opportunity, even if these things [alleged in the document] happened in 1984, 1988, how is that relevant to the instance charged here from March 27, 2010?" Defendant responded, "Because it is showing that he has a tendency to lie and also he has a tendency to lie." When the court asked whether defendant was involved in the alleged incidents, defendant responded, "I wasn't involved. He came and asked for our help, my family['s] help. He asked us to help him. He was living in Matteson at the time at 1124 Sherbet, Matteson, Illinois. And he had asked my family for help, Your Honor." The court noted that Officer Foltynewicz's cross-examination testimony contradicted defendant's claim that they previously knew each other and ruled that the allegations were inadmissible.

¶ 19      The trial court explained that defendant would not be allowed to give his version of events in closing argument if he did not testify. Defendant confirmed that he chose not to testify. He stated that he did so voluntarily. During the ensuing conference on jury instructions, defendant sought an instruction on reckless conduct, but the court denied his request. Defendant agreed to an instruction stating that his failure to testify could not be considered evidence against him.

¶ 20      In closing, defendant argued that the State's evidence was insufficient to prove him guilty. He stated that Officer Foltynewicz's testimony lacked corroboration and claimed, "It

is his word against mine." Over the State's objection, defendant showed the jury his asthma inhaler and stated, "This is medicine. That is my inhaler." The trial court sustained the State's objection to defendant's "cute display," in the prosecutor's words. It asked defendant whether he had any further argument, and defendant replied, "No." The court said, "All right. Thank you." Then defendant repeated, "That is my medicine."

¶ 21    After about 11 minutes of deliberation, the jury returned a guilty verdict. The trial court asked defendant whether he wished to have the jury polled. Defendant asked what that meant. The court explained it meant the jurors would be questioned individually what their verdicts were. Defendant stated he did not understand "what that is. What the world [*sic*] 'poll' is." The court proceeded to "poll the jury anyway." All jurors confirmed their guilty votes.

¶ 22    After the trial court dismissed the jurors, a question arose regarding defendant's notes on jury selection. The court asked the State whether those notes needed to be destroyed or preserved. It decided to retain his notes in a sealed envelope. As the court explained that the notes could be unsealed if necessary to an appellate argument, defendant interjected, "So I don't get to keep the jury people's things?" The court replied, "Right," and went on to explain that the procedure served security purposes by limiting defendant's access to jurors' home addresses and other personal information.

¶ 23    The presentence investigation (PSI) report prepared after trial contained a description of a March 31, 2011, "mental health diagnostic and treatment note." That treatment note was quoted as follows:

" 'The patient [(defendant)] is a 42-year-old black male. Psych medications are Haldol and Cogentin. The patient is alert. His affect is full. His speech is spontaneous. His mood is stable. However, his thought process is at times loose, at time [*sic*] making statements like "London family". Thought content has no SI, no HI. Possibility of auditory hallucinations. Insight and judgement [*sic*] are poor.

Diagnosis: Axis I–Schizophrenia

Summary and Treatment Plan: Stable at some levels, at other levels we need to avoid a decompensation. Therefore, I am going to increase the Haldol. I am going to make no other changes and I have encouraged the patient to increase his attended [*sic*] at groups and increase his spirituality. I will see the patient in one month. I have seen the patient do much worse than he is doing now, but I believe that we can do better.' "

In addition, the PSI report described defendant's criminal history and history of disciplinary incidents while incarcerated. It showed that defendant had been housed in Pontiac's mental health unit since July 2010 and was due to remain in disciplinary segregation until December 2012. Defendant had been invited to participate in the preparation of the PSI report but failed to respond.

¶ 24    In June 2011, the trial court held a sentencing hearing. In aggravation, the State rehashed defendant's criminal history as reported in the PSI. The State specifically emphasized that defendant had earlier been sentenced to return to prison only two months after he was discharged on a previous sentence.

¶ 25    The trial court asked defendant whether he wanted to testify "in relation to sentencing"

and the following exchange ensued:

> "THE DEFENDANT: Testify to what?
>
> THE COURT: To anything you want to tell me as far as the sentencing hearing.
>
> THE DEFENDANT: I ain't been able to introduce no evidence. You want me to testify, I ain't got no evidence, man."

Defendant then attempted to have admitted into evidence two *pro se* documents prepared in advance of the hearing. In one of the documents, defendant cited the eighth amendment's prohibition on excessive bail and cruel and unusual punishment (see U.S. Const., amend. VIII) and asked the court to transfer him from Pontiac because he feared harassment. The other document stated defendant "moves this Court pursuant too [*sic*] cause, records of proceedings and copy of all documents filed and trial transcripts." While the court reviewed those documents, defendant stated, "I guess, basically, I ain't got no defense. I ain't been discharged, so I don't know where you got that part from. I still been in prison. If I was discharged, I believe I wouldn't be back now." When the court noted that his comments were unresponsive, defendant continued, "Because I am just here at Pontiac, so what's going to be the next time? Something else, be at Pontiac again?" The court then determined that the documents were irrelevant to sentencing, but they should be included in the trial record.

¶ 26 The hearing then proceeded to argument and sentencing recommendations. The State recommended a 15-year sentence. Defendant elected not to make any argument concerning sentencing or to give a statement in allocution. The trial court went over its findings related to aggravating and mitigating factors. In mitigation, the court noted defendant's comportment during trial and the sentencing hearing. Specifically, the court stated, "[T]he defendant has been very cooperative, has not been disruptive whatsoever. He has conducted himself in a very dignified manner while he has been at least in front of this court as it pertains to this case, representing himself. And that is about it as far as mitigation is concerned." The court sentenced defendant to seven years in prison, to be served consecutively to his previous sentences. It asked defendant whether he had any questions pertaining to his sentence. Defendant began, "So the documents that I gave you, they don't need to get heard because–" The court interrupted and explained, "I will go through your appeal rights in a moment once we are done." Defendant replied, "All right."

¶ 27 The trial court then began to explain that defendant could choose to appeal or to move the court to reconsider his sentence. Defendant asked, "Can't I get a public defender or something?" The court finished admonishing defendant on his postsentencing options. Defendant announced his intention to appeal. The court directed the clerk to complete and file a notice of appeal on defendant's behalf. The court appointed the office of the State Appellate Defender to represent defendant on appeal.

¶ 28                                    II. ANALYSIS
¶ 29                                  A. Fitness Hearing
¶ 30 Defendant first argues that the trial court erred in not ordering a fitness hearing on its own motion in light of defendant's schizophrenia diagnosis and his behavior in proceedings

-8-

before the court. We disagree.

¶ 31    Subjecting an unfit defendant to criminal trial violates the defendant's due-process rights. *People v. Tapscott*, 386 Ill. App. 3d 1064, 1075, 899 N.E.2d 597, 607 (2008). Accordingly, although any party may raise the issue of a defendant's fitness to stand trial at an appropriate time, whenever a *bona fide* doubt of the defendant's fitness arises, the trial court must *sua sponte* order a determination of the defendant's fitness before proceeding further. *Id.* Whether a *bona fide* doubt of the defendant's fitness exists is a matter within the trial court's discretion. *Id.* Where no fitness hearing was held, we will reverse a conviction and remand for a new trial only where the trial court abused its discretion in failing to act on a *bona fide* doubt of the defendant's fitness. See, *e.g.*, *People v. Sandham*, 174 Ill. 2d 379, 389-91, 673 N.E.2d 1032, 1036-37 (1996). In evaluating the trial court's exercise of its discretion, we will keep in mind that the trial court is in a superior position to view the defendant's behavior firsthand and to determine based on its observation whether the requisite doubt exists. *Tapscott*, 386 Ill. App. 3d at 1075, 899 N.E.2d at 607.

¶ 32    A defendant is presumed fit for trial and sentencing. 725 ILCS 5/104-10 (West 2010). A defendant is *unfit* only if, because of a mental or physical condition, he is unable to understand the nature of the proceedings against him or to assist in his defense. 725 ILCS 5/104-10 (West 2010). Fitness concerns the defendant's functioning only in the context of trial and sentencing, such that "[a] person can be fit for trial although his mind may be otherwise unsound." (Internal quotation marks omitted.) *Tapscott*, 386 Ill. App. 3d at 1075, 899 N.E.2d at 607 (quoting *People v. Coleman*, 168 Ill. 2d 509, 524, 660 N.E.2d 914, 928 (1995)). Factors relevant to determining whether a *bona fide* doubt of the defendant's fitness exists include the rationality of the defendant's behavior and demeanor at trial, any prior medical opinions on the defendant's fitness, and defense counsel's representations concerning the defendant's competency. *Id.* at 1075-76, 899 N.E.2d at 607. A defendant's use of psychotropic medications may indicate unfitness but cannot alone override the presumption of fitness. 725 ILCS 5/104-21(a) (West 2010); *People v. Mitchell*, 189 Ill. 2d 312, 331, 727 N.E.2d 254, 266 (2000).

¶ 33    Nothing defendant points to in this case creates a *bona fide* doubt of his fitness to stand trial, in light of our deference to the trial court's observations. The PSI report suggests defendant was being treated for schizophrenia at the time of his trial, requiring medication and resulting in possible auditory hallucinations, loose reasoning, and poor judgment. However, the PSI report's discussion of defendant's schizophrenia diagnosis and treatment does not speak for itself. The cited treatment note provides no context for its description of defendant's apparently nonsensical outburst, "London family." It fails to define "SI" and "HI," two terms with which this court is not familiar. Was that the only instance that led the author of the treatment note to conclude that defendant possibly heard auditory hallucinations? What are the effects of the prescription medicines defendant was using–should the PSI report have led the court to question defendant's statement, at his initial appearance, that none of his medication affected his ability to think? In the author's opinion, was defendant unfit for trial or sentencing due to his mental illness? Unfortunately, the limited trial record does not permit defendant to engage in further analysis of the findings or to explain how the treatment note should affect our evaluation of the issue on appeal.

Nevertheless, nothing we perceive indicates that defendant's schizophrenia manifested during trial or sentencing or impaired defendant's capacity for understanding the nature of the proceedings against him or his ability to present his defense.

¶ 34 Defendant's sometimes artless representation of himself betrayed a lack of training and practice in the law. For instance, he appeared to believe at various times that the charge against him could not be substantiated absent bodily harm, even though the indictment was based on his causing contact of a provoking or insulting nature. He also appeared to misunderstand rules of evidence and procedure, such that the trial court's seemingly unexpected rulings obstructed his attempted impeachment of Officer Foltynewicz. He failed to present a procedurally appropriate opening statement or closing argument. However, these flaws in his defense were a risk inherent in his decision to forgo representation by appointed counsel. Indeed, the court had warned him when he waived his right to counsel that, if he were convicted, any possible misapprehension of the law on his part would not entitle him to a new trial.

¶ 35 Overall, defendant demonstrated throughout the proceedings in this case that he understood what was at stake and took measures to present an ultimately unsuccessful–but, evidently, reasoned–defense. Defendant understood that a conviction in this case would result in an additional 6 to 30 years on top of his previous prison sentences; he was admonished of the same on several occasions and repeated it himself. For the duration of the trial, defendant apparently adhered to the trial court's advice that he not expose his restraints to the jury. He participated reasonably in selecting a jury, excluding by peremptory challenge a venireperson with a professional relationship with the prosecutor and expressly seeking to ensure that he received a fair trial before an impartial jury. Defendant apparently tried to get Officer Foltynewicz to admit in cross-examination that he had a prior relationship with defendant that included all the tawdry behaviors defendant alleged in his writings and later oral claims before the court. His cross-examination as well as his writings, which he sought to have admitted but were inadmissible, reflected a strategy based on impeaching Officer Foltynewicz's credibility. That strategy, in the abstract, seems sound, given the likely unavailability of any other witness to the event besides defendant himself to offer an alternative, exculpatory version of events.

¶ 36 Defendant makes much of the grounds on which he sought to impeach Officer Foltynewicz–the allegations of corruption and unlawful and deplorable activities. According to defendant, either the allegations are a "plainly delusional" manifestation of defendant's unfitness for trial or they were factual, such that defendant was denied a fair trial based on Officer Foltynewicz's obvious incredibility. The State supposes that defendant simply mistook Officer Foltynewicz for another person who participated in the events defendant described. Neither party mentioned the further possibility that defendant consciously fabricated the allegations with the intent of discrediting Officer Foltynewicz's testimony. In any event, the trial court was in the best position to observe whether especially defendant's oral statements gave rise to a *bona fide* doubt of defendant's fitness, and the court apparently concluded they did not. Defendant's statements and allegations are not so plainly delusional and grandiose that, evaluating its exercise of discretion against a cold record, we would conclude the court erred in not ordering a fitness hearing.

¶ 37　　　　That significantly distinguishes this case from *Sandham*, 174 Ill. 2d at 389, 673 N.E.2d at 1036, where the supreme court reversed the defendant's conviction and remanded for a new trial. In that case, the supreme court focused on an exchange between the defendant and the trial court at his sentencing hearing. *Id.* at 386-87, 673 N.E.2d at 1035. In that discussion, the trial court attempted to explain to the defendant its twin goals in sentencing of obtaining rehabilitation for the defendant and protecting society from him. The defendant made some irrelevant comments, such as, " 'I don't see any way to protect me from this society,' " " 'I talked to my mother,' " and " 'I've got three albums on the top of the charts and comic books all over.' " (Emphasis omitted.) *Id.* at 386, 673 N.E.2d at 1035. Meanwhile, the trial court acknowledged the defendant's mental illness, commenting, " 'I don't fully understand the nature of mental illness. I don't think anyone does–even psychiatrists and psychologists.' " (Emphasis omitted.) *Id.* However, the trial court also expressed doubts as to the defendant's fitness, stating, " 'You don't even seem to understand what's going on. You are making comments that are obviously inappropriate,' " and " 'Whether you understand what I'm saying or not I am not sure.' " (Emphasis omitted.) *Id.* The supreme court concluded that the trial court's remarks and the defendant's delusional and unresponsive statements indicated a *bona fide* doubt of the defendant's fitness that the trial court ignored. *Id.* at 389, 673 N.E.2d at 1036. It concluded, "While it could well be argued that a *bona fide* doubt as to [the] defendant's fitness arose prior to these observations, there is no question that the trial judge had no discretion and was required to conduct, *sua sponte*, a fitness hearing at the point he questioned [the] defendant's capacity to comprehend what was transpiring at the sentencing hearing." *Id.*

¶ 38　　　　Here, in contrast with *Sandham*, the trial court never questioned whether defendant was consciously engaged in his trial and sentencing–defendant's awareness of the nature of the proceedings was evident in his participation in them. The court's comment that defendant appeared not to be making much sense at one point during trial is materially different from the trial court's doubts in *Sandham* concerning the defendant's capacity to understand what was happening around him. Defendant made no comments indicating that he was unaware of the nature of the ongoing proceedings. He developed a plan for his defense and, although it was ultimately determined to violate the rules of evidence, attempted to implement it. In these circumstances, notwithstanding some evidence suggesting he was being held in the prison's mental health unit and treated for schizophrenia, no *bona fide* doubt of defendant's fitness requiring reversal of his conviction arose during these proceedings.

¶ 39　　　　　　　　　　　　B. Sufficiency of the Evidence

¶ 40　　　　Defendant next argues that the State's evidence was insufficient to prove him guilty of aggravated battery beyond a reasonable doubt. Specifically, he contends the State failed to establish the essential element that the contact defendant caused by flinging an unknown liquid on Officer Foltynewicz was insulting or provoking in nature. We disagree.

¶ 41　　　　Where a defendant challenges the sufficiency of the evidence upon which he was convicted, we will affirm so long as, "viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond

-11-

a reasonable doubt." (Emphasis in original.) (Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007) (quoting *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We will not set aside a verdict on grounds of insufficient evidence unless the proof "is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of [the] defendant's guilt." *Id.* at 115, 871 N.E.2d at 740.

¶ 42    As charged in this case, an aggravated battery occurs when the defendant makes contact of an insulting or provoking nature with a person known to the defendant to be a state employee performing authorized duties. 720 ILCS 5/12-3(a)(2), 12-4(b)(18) (West 2010). Defendant challenges the sufficiency of the evidence showing that the contact in this case was of an insulting or provoking nature. That element of battery generally does not require proof by, for example, the victim's testimony that the contact was insulting or provoking. *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55, 959 N.E.2d 693. Rather, "the trier of fact can make that inference from the victim's reaction at the time." *Id.*

¶ 43    The evidence in this case permitted the inference that the contact was of an insulting or provoking nature. Officer Foltynewicz testified that, after defendant threw the unknown liquid on his face, he followed protocol by cleaning himself and seeking examination in the prison health care facility. Defendant asserts that Officer Foltynewicz's reaction, in that it was routine, was inconsistent with the jury's finding that the contact was of an insulting or provoking nature. To the contrary, the jury could have permissibly inferred the contact's insulting or provoking nature from the fact that it required a health examination (which just happened in this case to reveal the contents of the fluid to be innocuous). As frequently as inmates lamentably fling various substances at unsuspecting corrections officers, and as professionally as those corrections officers may handle it in certain circumstances, juries are nevertheless generally permitted to infer the insulting or provoking nature of those obviously repulsive contacts. See, *e.g.*, *People v. Bracey*, 345 Ill. App. 3d 314, 324, 800 N.E.2d 1248, 1256 (2003), *rev'd on other grounds*, 213 Ill. 2d 265, 821 N.E.2d 253 (2004) ("[D]efendant's throwing apple juice from the inside of his cell onto an unsuspecting correctional officer, who was not sure of the nature of the substance or whether it contained anything harmful, clearly amounts to an insulting or provoking contact ***."). Accordingly, the State's showing that defendant struck Officer Foltynewicz's face and chest with an unknown liquid was sufficient to support the guilty verdict in this case.

¶ 44                              III. CONCLUSION

¶ 45    For the foregoing reasons, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment as costs of this appeal.

¶ 46    Affirmed.