2021 IL App (1st) 192471-U

SIXTH DIVISION
April 30, 2021

No. 1-19-2471

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 6357 |
| | ) | |
| EDWARD PUGH, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the judgment of the circuit court, where the evidence at trial supported a reasonable inference that defendant knowingly struck a deputy sheriff, and that the contact was of an insulting or provoking nature.

¶ 2    Following a bench trial, defendant Edward Pugh was convicted of one count of aggravated battery to a peace officer and sentenced to three years in prison. On appeal, he argues that the State failed to prove him guilty beyond a reasonable doubt where the evidence did not show that he knowingly made contact with the victim or that his contact with the victim was of an insulting or provoking nature. We affirm.

¶ 3                                I. BACKGROUND

¶ 4       Mr. Pugh was charged by indictment with two counts of aggravated battery to a peace officer (720 ILCS 5/12-3.05(d)(4)(i) (West 2018)) following an incident in Chicago on April 17, 2018. The first count alleged that Mr. Pugh "knowingly caused bodily harm to [Deputy] Michael Paz" and the second count alleged that Mr. Pugh "knowingly made physical contact of an insulting or provoking nature with [Deputy] Michael Paz," knowing Deputy Paz to be a peace officer performing his official duties.

¶ 5       Cook County deputy sheriff Michael Paz testified that on the morning of April 17, 2018, he had transported inmates, including Mr. Pugh, from jail to the courthouse on Belmont and Western Avenues. At about 11:47 a.m., he was in the "lockup" area, or "bullpen," at the courthouse applying handcuffs, belly chains, and shackles on inmates so they could be transported back to the jail. Mr. Pugh had been separated from the other inmates and was not in the bullpen.

¶ 6       Mr. Pugh was brought into the bullpen, and Deputy Paz stood "[f]ace to face" with Mr. Pugh within an arm's-length distance. Deputy Paz handcuffed Mr. Pugh and attempted to place the belly chain around Mr. Pugh's waist, but Mr. Pugh "torqued his body *** away from [Deputy Paz]" in "a jerking motion." Deputy Paz tried to "get [Mr. Pugh] to calm down." Mr. Pugh called Deputy Paz an "old mother***" and said he "was going to f*** [Deputy Paz] up." Mr. Pugh "threw a right elbow" and hit Deputy Paz "[s]quare in the chest" near the right side, which "force[d] [Deputy Paz] to step back." Mr. Pugh tried to "strike" Deputy Paz again but missed because Deputy Paz had stepped back. Deputy Paz punched Mr. Pugh's head and "took [Mr. Pugh] down to the ground." Other deputies approached and finished securing Mr. Pugh's belly chain and shackles.

¶ 7       After punching Mr. Pugh, Deputy Paz's knuckle immediately swelled "two to three times its normal size," and the connective tissue therein had to be surgically repaired. Deputy Paz had

no injuries from the strike to his chest. Rather, he "felt the blow," his "adrenaline was racing," and he "immediately defended" himself.

¶ 8     On cross-examination, Deputy Paz confirmed that he wore a bulletproof vest that day. He also confirmed that Mr. Pugh had arrived at the courthouse wearing handcuffs, a blue box, and a belly chain, but Deputy Paz could not recall whether he removed them at the courthouse as his partner may have done it. He stated that a person wearing a blue box can raise their wrists to the middle of their torso, "[g]ive or take," above the belly button. Deputy Paz denied that Mr. Pugh asked Deputy Paz what Mr. Pugh's next court date was. He also stated that he tried to calm Mr. Pugh down by telling him to "calm down and stop resisting." Deputy Paz denied that he called for backup after Mr. Pugh elbowed him, or that Deputy Paz turned to Deputy Yolanda Lopez and said, "[c]an I get a hand here?" Deputy Paz stated that he was "in fear of receiving further battery."

¶ 9     Cook County deputy sheriff Yolanda Lopez testified that she was working at the courthouse that morning and saw Mr. Pugh and other inmates placed into the lockup. Mr. Pugh was placed in a separate cell because "[h]e was being aggressive, pounding on the doors, speaking foul language, threatening that he was going to kick everyone's a***, and stuff of that nature." At about 11:47 a.m., Deputy Lopez was in the lockup area, and Deputy Paz and other transportation officers arrived to cuff the inmates. Deputy Lopez explained that a chain was wrapped around the inmates and locked with a blue box. Deputy Paz had already handcuffed most of the inmates, was in front of Mr. Pugh, and attempted to "put the chain around" Mr. Pugh. The blue box was not secured, and Mr. Pugh was still able to move his upper torso. Mr. Pugh "resist[ed] by moving his body," said "I'm going to f*** you up you f***t," and "refus[ed] to be locked with the blue box with the chain." The court noted for the record that, while Deputy Lopez was testifying, she was "twisting her upper torso from left to right, and also thrusting her right elbow backwards."

¶ 10    Deputy Lopez testified Mr. Pugh struck Deputy Paz. Deputy Paz told Mr. Pugh "to calm down" and stated, "[d]ude, we've got to get you on the bus." Mr. Pugh attempted to strike Deputy Paz a second time but Deputy Paz "went back" and Mr. Pugh missed. Mr. Pugh was "getting out of control," and Deputy Paz hit Mr. Pugh. Deputy Paz "was able to *** get [Mr. Pugh] on the ground and finish cuffing him." Deputy Lopez then "called the guys" to help Deputy Paz ensure Mr. Pugh was cuffed properly. Deputy Lopez observed that Deputy Paz's hand was swollen after the incident.

¶ 11    On cross-examination, Deputy Lopez stated she could not recall any issues arising when Mr. Pugh first entered the courthouse and his restraints were removed. She stated that when Deputy Paz was struggling with Mr. Pugh, Mr. Pugh's handcuffs were on, but his blue box was not "tight," so Mr. Pugh was able to move his whole body, with the exception of his hands. Deputy Lopez was three or four feet away from the struggle and was standing at the door.

¶ 12    The defense moved for a directed finding. The court granted the motion as to Count 1, which alleged bodily harm, stating that Deputy Paz "did not indicate that there was any bodily harm caused to him," and that he was struck with an elbow to the chest while wearing a bulletproof vest. The court stated that Mr. Pugh's contact with Deputy Paz was "not something that would cause bodily harm." The court denied the motion as to Count 2.

¶ 13    Mr. Pugh testified that on April 17, 2018, he arrived at the courthouse in cuffs and belly chains, which were removed. Mr. Pugh stated that he suffers from depression and was placed in a second bullpen for "psyche patients." He further stated that he was on medication, which did not "affect [his] ability to testify," but affected his memory, though he "remember[s] the things that are important." At about 11:40 a.m., Deputy Paz approached the door of the bullpen, opened it, cuffed Mr. Pugh's hands in front of Mr. Pugh, and transported Mr. Pugh to the bullpen with the

other inmates. Mr. Pugh asked Deputy Paz when his next court date was, and Deputy Paz "immediately said *** that's not my job." Mr. Pugh and Deputy Paz then "got into a brief *** little argument," but Mr. Pugh could not remember what was said.

¶ 14   Deputy Paz positioned Mr. Pugh so that his back was against a wall and stood with his face within "breathing distance" from Mr. Pugh's face. Deputy Paz then hit Mr. Pugh "for no reason, because [Mr. Pugh] didn't even touch him." Mr. Pugh denied that he called Deputy Paz "old" or a "f***t." He also stated he could not have swung at Deputy Paz because he was handcuffed.

¶ 15   The defendant's brief on appeal notes that, on the misdemeanor trespass case that brought him to the courthouse where the aggravated battery occurred, Mr. Pugh was found unfit. However, on the aggravated battery case that is at issue on the appeal, the brief also notes, and the record confirms, that the court received three different clinical evaluations, which found Mr. Pugh fit to stand trial and sane at the time of the offense. The appellant does not contend that the finding of unfitness on the misdemeanor trespass charge should influence our consideration of this appeal.

¶ 16   The court found Mr. Pugh guilty of aggravated battery. The court stated that Deputy Paz and Deputy Lopez were credible witnesses, and Mr. Pugh admitted he did not "have a memory *** of what exactly occurred." The court also noted the testimony "was clear and proved that Mr. Pugh made physical contact of a provoking nature with Michael Paz" and "certainly knew Michael Paz was a peace officer."

¶ 17   The court denied Mr. Pugh's posttrial motion and sentenced him to three years in prison.

¶ 18                          II. JURISDICTION

¶ 19   Mr. Pugh was sentenced on November 1, 2019, and timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff.

Dec. 11, 2014), governing appeals from final judgments in criminal cases.

¶ 20                                    III. ANALYSIS

¶ 21    On appeal, Mr. Pugh asserts that the State failed to prove him guilty beyond a reasonable doubt, where the evidence was insufficient to show that he "knowingly made contact with [Deputy] Paz" or that his contact was "of an insulting or provoking nature." The State responds that the evidence clearly showed that Mr. Pugh was angry at Deputy Paz and deliberately struck out at him.

¶ 22    "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). When reviewing a challenge to the sufficiency of the evidence, this court considers " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)).

¶ 23    This court will not retry the defendant when reviewing a challenge to the sufficiency of the evidence at trial. *People v. Nere*, 2018 IL 122566, ¶ 69. Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000). The trier of fact need not "disregard inferences which flow normally from the evidence before it," or "search out all possible explanations consistent with innocence, and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v.*

*Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 24 As charged here, a person commits aggravated battery "when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be *** [a] peace officer *** performing his or her official duties." 720 ILCS 5/12-3.05(d)(4)(i) (West 2018). "A person commits battery if he or she knowingly without legal justification by any means *** makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2018). Mr. Pugh does not challenge the evidence demonstrating that he knew Deputy Paz was a peace officer performing his official duties. He argues only that the evidence was insufficient to show he knowingly made physical contact of an insulting and provoking nature with Deputy Paz.

¶ 25 Viewing the evidence in the light most favorable to the State as we must, we find it sufficient to prove Mr. Pugh guilty of aggravated battery of a peace officer. The State's evidence showed that, as Deputy Paz was attempting to place the chain around Mr. Pugh's waist, Mr. Pugh began to resist by twisting his body around. Deputy Paz and Deputy Lopez consistently testified that Mr. Pugh said that he was going to "f***k [Deputy Paz] up," insulted Deputy Paz, and then elbowed Deputy Paz in the chest. Deputy Paz testified the "blow" forced him to step back. As Deputy Paz tried to calm Mr. Pugh, Mr. Pugh then attempted to swing at Deputy Paz a second time but missed only because Deputy Paz stepped back. Given Mr. Pugh's threat to hurt Deputy Paz accompanying his blow to Deputy Paz's chest, the fact that the blow was forceful enough to cause Deputy Paz to step back, and the fact that Mr. Pugh swung at Deputy Paz not once but twice, a trier of fact could have reasonably inferred that Mr. Pugh knowingly made physical contact of an insulting or provoking nature with peace officer Deputy Paz.

¶ 26    Mr. Pugh asserts that the evidence failed to show that his contact with Deputy Paz was made knowingly, as opposed to accidentally or recklessly. However, the law is clear that "[a] person knows, or acts knowingly or with knowledge of *** [t]he result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2018). Further, "[w]hen the law provides that acting knowingly suffices to establish an element of an offense, that element also is established if a person acts intentionally." 720 ILCS 5/4-5 (West 2018). "A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2018).

¶ 27    As we have recognized, " 'knowingness' " is rarely proven by direct evidence, and the State must often establish it "based on the surrounding circumstances of the event." *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 27. To establish the requisite mental state in a battery case, the State must show "that [the] defendant's conduct was knowing or intentional, and not accidental." *People v. Phillips*, 392 Ill. App. 3d 243, 258 (2009).

¶ 28    As recounted above, the State's evidence showed that Mr. Pugh said he was going to "f*** [Deputy Paz] up," called Deputy Paz derogatory names, struck Deputy Paz a blow to the chest with his elbow, and then attempted to strike Deputy Paz again but missed only because Deputy Paz stepped back. It was not unreasonable for the trier of fact to infer that Mr. Pugh's contact with Deputy Paz was knowing and intentional. The actions that Mr. Pugh took directly followed his threat to "f***" Deputy Paz up. See *Phillips*, 392 Ill. App. 3d at 259 (finding the defendant's contact with a deputy sheriff was intentional and not accidental, where the defendant was angry at the officer prior to the battery, refused to enter a cell, and "started swinging his arms around").

¶ 29   Mr. Pugh suggests that the state of his mental health at the time of the incident raises a question as to whether he acted knowingly, as Mr. Pugh was "separated from other inmates for mental health reasons." However, while Mr. Pugh testified that he was placed in a bullpen for "psyche patients" and suffered from depression, Deputy Lopez testified that Mr. Pugh was separated from the other inmates at the courthouse because "[h]e was being aggressive, pounding on the doors, speaking foul language, threatening that he was going to kick everyone's a***, and stuff of that nature." There was no specific evidence showing that Mr. Pugh's mental state was such that he was not consciously aware of his conduct or that the conduct would result in striking Deputy Paz.

¶ 30   This case is quite different than *People v. Lee*, 2017 IL App (1st) 151652, ¶¶ 21-22, which Mr. Pugh relies on. In that case we found that the defendant did not knowingly commit aggravated battery where he was "a diagnosed schizophrenic," learned that his partner and son had been in a car accident in which his son was killed, attempted suicide by overdosing on prescription medication, and "inadvertently struck" the complainant while "behaving turbulently and yelling indiscriminately" in the emergency room. In that case it was clear that the defendant was not "consciously aware" of the results of his actions and lacked the requisite criminal intent.

¶ 31   Mr. Pugh also argues that the evidence was insufficient to find his contact with Deputy Paz was of an insulting or provoking nature. A defendant's contact need not injure a victim to be insulting or provoking. *People v. DeRosario*, 397 Ill. App. 3d 332, 333-35 (2009). Illinois courts have found that a defendant's conduct was of an insulting or provoking nature where the defendant spat on the face of a police officer (*People v. Peck*, 260 Ill. App. 3d 812, 814-15 (1994)), poked a school teacher in the chest during an argument in a parking lot (*People v. Dunker*, 217 Ill. App. 3d 410, 411-12, 415 (1991)), or touched his knees to the complainant's back and hip while in the

process of sitting down, after "stalking" the complainant and "sitting and staring at her for long periods" (*DeRosario*, 397 Ill. App. 3d at 332-35).

¶ 32    The trier of fact determines whether any contact is insulting or provoking, based upon the factual context in which it occurs. *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 49 (citing *DeRosario*, 397 Ill.App.3d at 334). The victim of a battery need not testify specifically that they were provoked or insulted. *Id*. (citing *People v. Wrencher*, 2011 IL App (4th) 080619, ¶ 55).

¶ 33    Mr. Pugh argues that because Deputy Paz was a deputy sheriff used to dealing with "difficult inmates," he was in a different position than an ordinary citizen and his "incidental" contact with Mr. Pugh's elbow should not rise to the level of physical contact of an insulting or provoking nature. While Mr. Pugh may be right that Deputy Paz had similar contacts with unruly inmates routinely as a part of his job, the trier of fact still could have found that Mr. Pugh's contact was insulting or provoking. As we have recognized, "[a]s frequently as inmates lamentably fling various substances at unsuspecting corrections officers, and as professionally as those corrections officers may handle it in certain circumstances, juries are nevertheless generally permitted to infer the insulting or provoking nature of those obviously repulsive contacts." *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 43. The judge, as the trier of fact in this case, found that Mr. Pugh's contact with Deputy Paz was insulting or provoking and the evidence was sufficient to sustain this finding.

¶ 34                                    IV. CONCLUSION

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 36    Affirmed.