# Illinois Official Reports

## Appellate Court

***People v. Shaw*, 2015 IL App (4th) 140106**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL D. SHAW, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0106 |
| Filed | December 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 13-CF-231; the Hon. Thomas J. Difanis, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Amanda S. Kimmel (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justice Appleton concurred in the judgment and opinion.<br>Justice Steigmann specially concurred, with opinion. |

**OPINION**

¶ 1        A jury found defendant, Paul D. Shaw, guilty of attempt (criminal sexual assault) (720 ILCS 5/8-4(a), 11-1.20(a)(1) (West 2012)) and the trial court sentenced him to 30 years in prison. Defendant appeals, arguing (1) the court erred by failing to conduct an independent inquiry into his fitness prior to trial and to *sua sponte* raise the issue of fitness at trial or sentencing, (2) defense counsel provided ineffective assistance by failing to request a fitness examination at trial or prior to sentencing, and (3) the court improperly failed to investigate defendant's ineffective assistance of counsel claims pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). We affirm.

¶ 2                                        I. BACKGROUND

¶ 3        On February 8, 2013, the State charged defendant with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(1), (a)(2) (West 2012)) (counts I and II); two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(a)(6) (West 2012)) (counts III and IV); and two counts of attempt (criminal sexual assault) (720 ILCS 5/8-4(a), 11-1.20(a)(1), (a)(2) (West 2012)) (counts V and VI). Ultimately, counts II, III, IV, and VI were dismissed on the State's motion and defendant's trial proceeded only on counts I and V. With respect to count I, charging defendant with criminal sexual assault, the State specifically alleged defendant "committed an act of sexual penetration by the use of force with [the victim, E.B.,] in that [he] penetrated [E.B.'s] vagina with his finger. In connection with count V, charging defendant with attempt (criminal sexual assault), the State alleged that, with the intent to commit the offense of criminal sexual assault, defendant "performed a substantial step toward the commission of that offense[,] in that he, by the use of force, tried to put his penis in [E.B.'s] mouth."

¶ 4        On April 12, 2013, prior to defendant's trial, defense counsel filed a motion for appointment of a psychiatrist pursuant to section 104-11(b) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/104-11(b) (West 2012)). Counsel alleged he had a *bona fide* doubt as to defendant's fitness and requested the trial court appoint a psychiatrist to examine defendant. On April 17, 2013, the court entered an order, appointing Dr. Lawrence Jeckel to examine defendant.

¶ 5        On May 17, 2013, a report authored by Dr. Jeckel was filed with the trial court. With respect to defendant's mental health history, Dr. Jeckel noted that defendant reported being "hospitalized *** for one year and five months in 1993 and prescribed clonidine, lithium[,] and fluoxetine (Prozac) for depression and anger. The next year, he was hospitalized for two years and five months ***." Additionally, he stated jail records showed that, on April 25, 2013, defendant "was observed to be acting strangely; he was frequently masturbating and exposing himself in general population." On examination, Dr. Jeckel noted defendant "answered questions promptly and appropriately." He found defendant was also "often vague and rambling at times, but he could be easily redirected." Dr. Jeckel further stated as follows:

            "[Defendant] did not appear to be responding to internal stimuli. There was no evidence of looseness of associations or flight of ideas. Thoughts, again, were

somewhat tangential and rambling, but he could clarify and be more concise if prompted. When he tried to defend himself against the [deoxyribonucleic acid (DNA)] evidence, he became more vague and more rambling. He denied current hallucinations, delusions, ideas of reference, ideas of influence or paranoid ideation."

¶ 6    Dr. Jeckel diagnosed defendant with "History of Psychotic Disorder, NOS"; "Probable Depressive Disorder, NOS"; and "Antisocial Personality Disorder." Nevertheless, he opined defendant was fit to stand trial, finding defendant was "able to understand the nature and purpose of the proceedings against him and [could] assist his attorney in his defense." As a basis for his opinion, Dr. Jeckel stated he found defendant "to be relatively clear and coherent" and that he did not observe any evidence of psychosis. Further, he noted defendant appropriately answered questions about the functions of the various participants in a court of law. Ultimately, Dr. Jeckel asserted he "did not find any evidence of a severe mental illness that would prevent [defendant] from working with his attorney."

¶ 7    After the filing of Dr. Jeckel's report, no further action was taken regarding the issue of defendant's fitness until August 30, 2013, when defense counsel filed a motion for a fitness hearing pursuant to section 104-16 of the Code (725 ILCS 5/104-16 (West 2012)). He alleged he had recently spoken with defendant and believed defendant's mental health had deteriorated. Counsel asserted he continued to have a *bona fide* doubt as to whether defendant truly understood the nature and purpose of the proceedings against him and he believed defendant was unable to assist in his defense. He requested the trial court conduct a hearing to determine the issue of defendant's fitness.

¶ 8    On September 4, 2013, the parties appeared before the trial court in connection with defense counsel's motion. Counsel reasserted his belief that defendant's mental condition had deteriorated since defendant was evaluated by Dr. Jeckel. In response, the trial judge stated, "[t]hat would not, quite frankly, surprise me." Ultimately, the court ordered a second fitness examination and appointed Dr. Albert Lo to examine defendant.

¶ 9    On October 21, 2013, a report authored by Dr. Lo was filed with the trial court. Dr. Lo noted defendant reported a past medical history that included having no memory between the ages of 8 and 11 due to being hit by a truck. Defendant also reported a previous psychiatric history that included treatment with clonidine, lithium, and Prozac and admittance to a psychiatric hospital. On examination of defendant, Dr. Lo noted as follows:

"[Defendant] was wearing typical jail clothing and appeared to be mostly cooperative during the interview. At times he was difficult to converse with, as he would go into long rambling sentences which did not seem to contain a great deal of information. As an example, he stated to me that 'a person considered charged for violation of suspicion failed at a description, that's what they had did. That what they had witness, actually they see other guys[.'] [Defendant] at times would become irritated during the interview, but was mostly cooperative. The irritability appeared to center around his legal issues and at times when I attempted to discuss the legal situation, he would become more animated and speak long sentences that didn't make sense."

With respect to defendant's speech, Dr. Lo specifically found defendant to be "mostly coherent with no abnormalities in rate or tone." However, he reiterated that "at times" defendant spoke "in a mannerism where he [said] a great deal about nothing in sentences that [did] not make a great deal of sense, but [did] not appear to be part of a psychotic disorder."

- 3 -

¶ 10    Dr. Lo further noted that defendant had an extensive history of legal difficulties and substance abuse. He stated jail mental health workers had numerous difficulties with defendant, including that he compulsively masturbated in front of other inmates. Jail personnel were "concerned about mental illness" and had "also notice[d] the same odd manner of speech at times." According to Dr. Lo, defendant reported that he was paranoid, suspicious, and "doesn't trust 'any of these people.' " Nevertheless, Dr. Lo found defendant was fit to stand trial, in that defendant was able to understand the nature and purpose of the legal proceedings against him. Dr. Lo stated as follows:

> "[Defendant] is able to discuss the function of a Judge, Jury, and the difference between a bench trial and a jury trial. He is also able to discuss the function of an attorney and the difference in [the] types of pleas of guilty and not guilty. He understands the meaning of sentencing, probation[,] and other legal terms, leading me to believe he is able to understand the legal proceedings and charges against him. He does express some suspicion about his attorney. He expresses some distrust and makes some demands that his attorney follow his instructions in regards to his case. They do not appear to be psychotic requests, but he appears to be unreasonable in the expectations of what an attorney can do for him."

Ultimately, Dr. Lo set forth his diagnoses as "Marijuana Abuse"; "Rule out Mood Disorder[,] NOS"; "Antisocial Personality Disorder"; and "Multiple Physical Complaints."

¶ 11    The record reflects defendant's case was set for trial on November 18, 2013. That day, the parties appeared before the trial court and initially addressed the issue of defendant's fitness. The following colloquy occurred between the court, defense counsel, and the State:

> "THE COURT: All right. So Mr. Vargas [(defense attorney)], you did get the report from Dr. Lo dated October 9th?
>
> MR. VARGAS: Yes, Judge.
>
> THE COURT: And you got yours, Mr. Lozar [(assistant State's Attorney)]?
>
> MR. LOZAR: Yes, Judge, and I stipulate to the contents.
>
> THE COURT: And Mr. Vargas, you would stipulate that if Dr. Lo were called to testify, he would testify as set forth in his report dated October 9th?
>
> MR. VARGAS: Yes, Judge. Further, I've gone I think above and beyond. The court has given me great leeway to make sure that my client is fit, so–
>
> THE COURT: All right.
>
> MR. VARGAS: He has been examined by two different doctors.
>
> THE COURT: Mr. Lozar, the same stipulation?
>
> MR. LOZAR: Yes, Your Honor.
>
> THE COURT: We will show based upon the evidence presented, the court finds the defendant is now fit to plead and/or stand trial."

The court's November 18, 2013, docket entry states: "Parties stipulate to the Dr. Lo finding the Defendant FIT to stand trial."

¶ 12    At trial, the State presented evidence that E.B. spent the night at a friend's apartment after attending a party there and becoming intoxicated. She awoke to a man trying to remove her clothes. E.B. testified she struggled with the man and tried to resist but he removed her shorts and put his finger in her vagina. She also recalled the man tried to force her to give him oral

- 4 -

sex. The following day, E.B. reported the incident and underwent a sexual assault examination. Evidence was collected, including E.B.'s underwear. The State further presented evidence that forensic testing revealed the presence of semen on E.B.'s underwear, which matched defendant's DNA profile.

¶ 13      Against defense counsel's advice, defendant elected to testify on his own behalf. Upon questioning by his counsel, defendant provided his name and age, and he identified himself as a resident of Champaign County. Counsel next asked defendant what he wanted to tell the jury. Defendant responded with a lengthy narrative statement, which was largely rambling and nonsensical.

¶ 14      After the parties finished presenting evidence but prior to closing arguments, defense counsel informed the trial court that he wanted to bring a matter to the court's attention. The following colloquy then occurred between defense counsel and the court:

"MR VARGAS: My client has indicated that he would like a different attorney at this time. I've explained to him that it's a little too–a day late and a dollar short, so to speak, but I told him I would bring it to the court's attention.

THE COURT: Well, at this point, [defendant], we are to the end of the trial, and I am not going to–it would be impossible to have another attorney appointed to represent you even if I was so inclined. The only way that would be done–well, it's not going to be done. So, I understand the request, and the request is denied."

On November 20, 2013, the jury returned a verdict, finding defendant guilty of attempt (criminal sexual assault).

¶ 15      On December 17, 2013, defendant filed a posttrial motion for acquittal, or in the alternative, a new trial, raising arguments not at issue on appeal. On December 27, 2013, the trial court denied defendant's motion and conducted his sentencing hearing. During the hearing, defendant made the following statement on his own behalf:

"Due to the fact that it was not the area pretty much the time around where it might have been some events that it might been just you a little bit too early to say that anything happened, as such as it is. And after that, it pretty much was just something that was just going by. But due to the fact that it been areas that I probably at, been just walking away and probably not had seen the individual, not even tentative go to the area or disturb anyone, it was just some things that I was just dealing with, as far as me just traveling somewhere.

And as far as being to the state of mind of being to the fact, like, I consider myself not to be issues that I can definitely work on, as–as it go on and it's being discussed amongst the Court, or you know, whatever decision that is, then that's what I'm able to do.

I–I think the lower range, as my attorney had asked for, is definitely the situation that I need to be for, so."

Ultimately, the court sentenced defendant to 30 years in prison.

¶ 16      On January 8 and 21, 2014, *pro se* letters from defendant were filed. In his correspondence, which consisted of four handwritten pages, defendant requested an appeal, resentencing, and a new trial. The record reflects his *pro se* letters were rambling and difficult to understand. In a letter filed January 8, 2014, defendant stated, in part: "I was not the person who commit this crime and was held early befor [*sic*] it allgely [*sic*] happen it was misused in court on several

court dates to argue improper counsel." In a second *pro se* letter filed on January 8, 2014, defendant stated: "I ask for new trial it was improper handling through the court." Finally, in correspondence filed January 21, 2014, defendant stated, in part, as follows: "I ask reviewing a court date arguing a prolific argument from a attorney to a client."

¶ 17 On January 22, 2014, defendant's counsel filed a motion to reconsider, arguing defendant's sentence was excessive. On February 10, 2014, the trial court denied the motion.

¶ 18 This appeal followed.

¶ 19 II. ANALYSIS
¶ 20 A. Defendant's Fitness
¶ 21 1. *Defendant's Fitness Prior to Trial*

¶ 22 On appeal, defendant first argues his fitness hearing failed to meet minimal due process requirements. Specifically, he contends the trial court erred by simply accepting the parties' stipulations with respect to Dr. Lo's report rather than conducting an independent inquiry into whether he was fit to stand trial. Defendant asks this court to remand the matter for a new fitness hearing and, if necessary, a new trial.

¶ 23 Initially, we note defendant acknowledges that he failed to preserve this issue for appellate review. However, he asserts, and we agree, that the issue may be reviewed for plain error. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28, 34 N.E.3d 560 (stating a defendant's fitness for trial involves a fundamental right and "alleged errors concerning fitness may be reviewed under the plain error doctrine").

¶ 24 Due process bars the prosecution of a defendant who is unfit to stand trial. *People v. Holt*, 2014 IL 116989, ¶ 51, 21 N.E.3d 695. "A defendant is presumed to be fit" but will be deemed "unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2012).

¶ 25 The Code provides that the trial court "shall conduct a hearing to determine the issue of the defendant's fitness within 45 days of receipt of the final written report of the person or persons conducting the examination." 725 ILCS 5/104-16(a) (West 2012). "On the basis of the evidence before it, the court *** shall determine whether the defendant is fit to stand trial or to plead." 725 ILCS 5/104-16(d) (West 2012). "Normally, a trial court's decision that a defendant is fit to stand trial will not be reversed absent an abuse of discretion." *People v. Contorno*, 322 Ill. App. 3d 177, 179, 750 N.E.2d 290, 292 (2001). "However, because this issue is one of constitutional dimension, the record must show an affirmative exercise of judicial discretion regarding the determination of fitness." *Contorno*, 322 Ill. App. 3d at 179, 750 N.E.2d at 292. When assessing a defendant's fitness, the trial court "should be active, not passive." *Gipson*, 2015 IL App (1st) 122451, ¶ 29, 34 N.E.3d 560 (citing *People v. Thompson*, 158 Ill. App. 3d 860, 865, 511 N.E.2d 993, 996 (1987)).

¶ 26 "A trial court's determination of fitness may not be based solely upon a stipulation to the existence of psychiatric conclusions or findings." *Contorno*, 322 Ill. App. 3d at 179, 750 N.E.2d at 292. "However, where the parties stipulate to what an expert would testify, rather than to the expert's conclusion, a trial court may consider this stipulated testimony in exercising its discretion." *Contorno*, 322 Ill. App. 3d at 179, 750 N.E.2d at 292. "The distinction between proper and improper stipulations, however, is a fine one." *Gipson*, 2015 IL

App (1st) 122451, ¶ 30, 34 N.E.3d 560. "The ultimate decision as to a defendant's fitness must be made by the trial court, not the experts" and "[a] trial court must analyze and evaluate the basis for an expert's opinion instead of merely relying upon the expert's ultimate opinion." *Contorno*, 322 Ill. App. 3d at 179, 750 N.E.2d at 292-93. "Where the trial court's determination is based on not only stipulations, but on the court's review of a psychological report and the court's own observations of the defendant, due process is generally satisfied." *Gipson*, 2015 IL App (1st) 122451, ¶ 30, 34 N.E.3d 560.

¶ 27    In *People v. Lewis*, 103 Ill. 2d 111, 468 N.E.2d 1222 (1984), the supreme court addressed the issue of proper and improper stipulations in the context of a fitness hearing. There, the court reviewed two consolidated appeals in which the circuit courts found the defendants involved had been restored to fitness based on stipulated evidence. *Lewis*, 103 Ill. 2d at 113-14, 468 N.E.2d at 1223-24. In one case, the parties stipulated that a psychiatrist had examined the defendant and, if called as a witness, "would testify that he had examined [the] defendant and, based upon his examination, [the] defendant was now mentally fit for trial, able to understand the nature of the charges pending against him, and able to cooperate with counsel in his own defense." *Lewis*, 103 Ill. 2d at 113, 468 N.E.2d at 1223. In the second case, the parties similarly stipulated that a psychiatrist would testify that he examined the defendant and, after observing and interviewing the defendant, opined " 'that the defendant is mentally fit to stand trial and that he understands the nature of the charges pending against him, the purpose of the proceedings, and that he is able to cooperate with counsel in his own defense.' " *Lewis*, 103 Ill. 2d at 114, 468 N.E.2d at 1224.

¶ 28    Ultimately, the supreme court determined "that the circuit courts did not err in considering the stipulations regarding the psychiatrists' opinions as to [the] defendants' fitness." *Lewis*, 103 Ill. 2d at 116, 468 N.E.2d at 1225. In so holding, it distinguished cases involving stipulations "to the conclusion that the defendant had 'recovered from said insanity to the degree that he can now co-operate with his counsel and can enter a plea.' [Citation.]" and "to 'the findings of the two psychiatrists as contained in the reports and *** to the fact that the defendant is fit for trial.' [Citation.]" *Lewis*, 103 Ill. 2d at 115-16, 468 N.E.2d at 1225. The court noted that, in the case before it, "[t]he stipulations were not to the fact of fitness, but to the opinion testimony which would have been given by the psychiatrists. Upon considering these stipulations and personally observing defendants, the circuit court could find defendants fit, seek more information, or find the evidence insufficient to support a finding of restoration to fitness." *Lewis*, 103 Ill. 2d at 116, 468 N.E.2d at 1225.

¶ 29    The State maintains that, pursuant to *Lewis*, the trial court in the instant case appropriately relied on stipulated evidence to find defendant fit to stand trial. We agree.

¶ 30    The record shows that, on November 18, 2013, immediately prior to defendant's trial, the trial court and the parties addressed the issue of defendant's fitness. The court asked the parties if they "would stipulate that if Dr. Lo were called to testify, he would testify as set forth in his report dated October 9th." Both the State and defendant's counsel stated they would and no further evidence was offered or presented as to the issue of fitness. The court then stated that it found defendant fit to stand trial "based upon the evidence presented." We find the stipulations made by the parties and accepted by the court were proper as the record reflects they were based on the opinion testimony Dr. Lo would have given if called to testify rather than solely his ultimate conclusion that defendant was fit to stand trial. The court was free to rely on the

parties' proper stipulations–the only evidence presented as to defendant's fitness–when exercising its discretion and determining whether defendant was fit to stand trial.

¶ 31    On appeal, defendant points to the trial court's November 18, 2013, docket entry, which stated the "[p]arties stipulate to the Dr. Lo finding the Defendant FIT to stand trial," as providing support for his position. He argues the docket entry evidences the lack of independent judicial analysis by the court with respect to the issue of fitness. We disagree and find the court's actual comments in open court present a more comprehensive and reliable reflection of the court's considerations and exercise of its discretion.

¶ 32    Based on the circumstances presented here, we find the trial court committed no error in finding defendant fit to stand trial. The record reflects the trial court relied on proper stipulations as to the psychiatric expert's opinion testimony rather than the expert's ultimate conclusions. Thus, the court appropriately exercised its discretion and independent judgment when addressing the issue of defendant's fitness for trial. We find the cases cited by defendant are distinguishable from the facts presented in this case and his argument is without merit.

¶ 33                    2. *Defendant's Fitness During Trial and Sentencing*

¶ 34    On appeal, defendant also raises additional issues with respect to his fitness during his trial and sentencing. Specifically, he argues that he became incomprehensible during his trial and sentencing, evidencing a deterioration of his mental condition and raising a *bona fide* doubt as to his continued fitness. As a result, he maintains the trial court erred by failing to *sua sponte* order a fitness examination and his trial counsel was ineffective for not requesting a further fitness examination. With respect to these additional contentions, defendant asks this court to vacate his conviction and remand for a new trial.

¶ 35    "[A]lthough any party may raise the issue of a defendant's fitness to stand trial at an appropriate time, whenever a *bona fide* doubt of the defendant's fitness arises, the trial court must *sua sponte* order a determination of the defendant's fitness before proceeding further." *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 31, 979 N.E.2d 1002. "Factors relevant to determining whether a *bona fide* doubt of the defendant's fitness exists include the rationality of the defendant's behavior and demeanor at trial, any prior medical opinions on the defendant's fitness, and defense counsel's representations concerning the defendant's competency." *Nichols*, 2012 IL App (4th) 110519, ¶ 32, 979 N.E.2d 1002. "Whether a *bona fide* doubt of the defendant's fitness exists is a matter within the trial court's discretion." *Nichols*, 2012 IL App (4th) 110519, ¶ 31, 979 N.E.2d 1002. On review, we will reverse a defendant's conviction and remand for a new trial only when "the trial court abused its discretion in failing to act on a *bona fide* doubt of the defendant's fitness." *Nichols*, 2012 IL App (4th) 110519, ¶ 31, 979 N.E.2d 1002.

¶ 36    Additionally, to establish a claim for ineffective assistance of counsel, a defendant must show "both that his attorney's performance was deficient and that he was prejudiced as a result of the deficient performance." *People v. Tapscott*, 386 Ill. App. 3d 1064, 1078, 899 N.E.2d 597, 610 (2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "The failure to establish either prong is fatal to a defendant's claim" and "[a] court need not consider whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Tapscott*, 386 Ill. App. 3d at 1078, 899 N.E.2d at 610.

¶ 37    Further, to establish that he was prejudiced when arguing that his counsel was ineffective for failing to seek a fitness hearing, a "defendant 'must demonstrate that facts existed at the

- 8 -

time of his trial which raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense.' " *Tapscott*, 386 Ill. App. 3d at 1079, 899 N.E.2d at 610 (quoting *People v. Eddmonds*, 143 Ill. 2d 501, 512-13, 578 N.E.2d 952, 957 (1991)). "Therefore, defendant must demonstrate that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing had defense counsel requested it under the circumstances presented." *Tapscott*, 386 Ill. App. 3d at 1079, 899 N.E.2d at 610.

¶ 38    Here, in arguing that his mental health had further deteriorated after Dr. Lo's evaluation, defendant primarily relies on his trial testimony, which occurred less than two months after Dr. Lo's October 9, 2013, report, and his statement in allocution at sentencing, which occurred less than three months after the date of Dr. Lo's report. Although, in both instances, defendant made statements that, in large part, were rambling and difficult to understand, we reject defendant's position that his statements reflect a worsening of his mental health. Specifically, while Dr. Lo and Dr. Jeckel both found defendant fit to stand trial, each doctor made a point to note that defendant would speak in a manner that was rambling and nonsensical.

¶ 39    In his report, Dr. Lo stated defendant was, at times, "difficult to converse with" and "would go into long rambling sentences which did not seem to contain a great deal of information." He further noted that, when discussing his legal situation, defendant "would become more animated and speak long sentences that didn't make sense." Dr. Lo reiterated that "at times" defendant spoke "in a mannerism where he [said] a great deal about nothing in sentences that [did] not make a great deal of sense, but [did] not appear to be part of a psychotic disorder." According to Dr. Lo, jail personnel had "also notice[d] the same odd manner of speech at times." Similarly, months earlier, Dr Jeckel found defendant was "often vague and rambling at times, but he could be easily redirected." Further, he noted defendant's "[t]houghts *** were somewhat tangential and rambling, but he could clarify and be more concise if prompted. When he tried to defend himself against the DNA evidence, he became more vague and more rambling."

¶ 40    In this instance, the manner of speech defendant exhibited at trial and at sentencing was consistent with the observations of both Dr. Lo and Dr. Jeckel at the time of their respective fitness evaluations. As a result, the record fails to reflect defendant's mental health changed in any significant way from the time his fitness for trial was evaluated and the time of his trial or sentencing. Under these circumstances, the trial court committed no error by failing to *sua sponte* order a fitness hearing during the trial and sentencing phases of the underlying proceedings. For the same reasons, defendant failed to establish his counsel's ineffectiveness.

¶ 41                              B. *Krankel* Inquiry

¶ 42    Finally, defendant argues on appeal that the trial court failed to inquire into his *pro se* ineffective assistance of counsel claims. He maintains he raised ineffective assistance claims that the court should have investigated both during his trial and after his sentencing.

¶ 43    "The common law procedure developed in *Krankel* and subsequent cases is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *People v. Patrick*, 2011 IL 111666, ¶ 41, 960 N.E.2d 1114. Pursuant to *Krankel*, the following procedure has developed:

> "New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. Rather, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial

court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." *People v. Moore*, 207 Ill. 2d 68, 77-78, 797 N.E.2d 631, 637 (2003).

¶ 44    "[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention ***." *Moore*, 207 Ill. 2d at 79, 797 N.E.2d at 638. On review, "[t]he operative concern *** is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 638. A trial court may conduct an adequate inquiry into a defendant's claims by questioning defense counsel, questioning the defendant, or by relying on its own knowledge of defense counsel's performance. *Moore*, 207 Ill. 2d at 78-79, 797 N.E.2d at 638. Whether the trial court conducted a proper *Krankel* inquiry presents a legal question that is subject to *de novo* review. *People v. Jolly*, 2014 IL 117142, ¶ 28, 25 N.E.3d 1127.

¶ 45    In *People v. Taylor*, 237 Ill. 2d 68, 75-76, 927 N.E.2d 1172, 1176 (2010), the supreme court considered whether a defendant's statement at his sentencing constituted a *pro se* ineffective assistance of counsel claim that was sufficient to trigger a *Krankel* inquiry. In finding that it was not, the court initially noted "that nowhere in [the] defendant's statement at sentencing did he specifically complain about his attorney's performance, or expressly state he was claiming ineffective assistance of counsel." *Taylor*, 237 Ill. 2d at 76, 927 N.E.2d at 1176. Further, the court stated as follows:

"As the State correctly notes, there is nothing in [the] defendant's statement specifically informing the court that [the] defendant is complaining about his attorney's performance. Indeed, defendant does not mention his attorney. In addition, because of the rambling nature of [the] defendant's statement, it is amenable to more than one interpretation. For example, according to the State, 'defendant's statement merely shows regret at not accepting the more advantageous plea deal before trial, and not that he rejected the offer based upon a material misunderstanding of what sentence he faced.' [Citation] (rejecting argument that trial court erred in failing to give particular jury instruction, stating: 'If a defendant does not articulate his theory *** he cannot reasonably expect the trial court, unaided, to divine his intent'). If defendant's statement in the case at bar were deemed sufficient to require a *Krankel* inquiry, few statements would be insufficient. We agree with the State that defendant's statement at sentencing was insufficient to require such an inquiry." *Taylor*, 237 Ill. 2d at 77, 927 N.E.2d at 1177.

¶ 46    Here, the record similarly fails to contain any specific or express complaints by defendant about his counsel's performance. At trial–after the parties' presentation of evidence but prior to closing arguments–defendant's counsel informed the trial court that defendant wanted a different attorney. However, no specific ineffective assistance of counsel claims were raised at that time and there is nothing in the record to indicate the basis for defendant's desire for new counsel.

¶ 47    Following his sentencing, defendant *pro se* also sent letters to the trial court. His correspondence consisted of four handwritten pages, in which he expressly requested an appeal, resentencing, and a new trial. Again, defendant's letters fail to contain even a bare claim of ineffective assistance of counsel. Although in one sentence he used the phrase

- 10 -

"improper counsel" (stating, "I was not the person who commit this crime and was held early befor [*sic*] it allgely [*sic*] happen it was misused in court on several court dates to argue improper counsel"), his letters are rambling and his meaning is unclear. Further, sentences in which defendant asked for a new trial based on "improper handling through the court" and "a court date arguing a prolific argument from a attorney to a client" do not necessarily implicate issues related to his counsel's representation or performance. Like in *Taylor*, defendant's statements could be amenable to more than a single interpretation.

¶ 48 Under the circumstances presented, both defendant's request for new counsel at trial and the statements made in his postsentencing *pro se* correspondence were insufficient to warrant a *Krankel* inquiry. The trial court committed no error.

¶ 49                                III. CONCLUSION

¶ 50 For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs for this appeal.

¶ 51 Affirmed.

¶ 52 STEIGMANN, J., specially concurring.

¶ 53 Although I fully agree with the majority, I write this special concurrence because of my concerns about *Lewis*. This court cannot overrule decisions of the Supreme Court of Illinois. But we can call to that court's attention one of its decisions that we respectfully suggest requires reconsideration. Thirty years' experience with *Lewis* has shown that it is unnecessary and imposes unwarranted costs upon the criminal justice system.

¶ 54 *Lewis* stands for the proposition that the parties can stipulate to what an expert would testify, but a trial court may not accept a stipulation regarding a defendant's fitness. *Supra* ¶¶ 28-29. Specifically, the supreme court in *Lewis* noted that in the cases before it, the parties stipulated that if called to the witness stand, the qualified psychiatrists who had examined the respective defendants would testify that in their opinions, each of the defendants was mentally fit to stand trial. The supreme court then explained that "[t]he stipulations were not to the fact of fitness, but to the opinion testimony which would have been given by the psychiatrists. Upon considering these stipulations and personally observing [the] defendants, the circuit court could find [the] defendants fit, seek more information, or find the evidence insufficient to support a finding of restoration to fitness." *Lewis*, 103 Ill. 2d at 116, 468 N.E.2d at 1225.

¶ 55 In my opinion, the distinction drawn by *Lewis* between a stipulation that (1) a defendant is fit to stand trial based upon an uncontested psychiatric report and (2) the court may consider that same psychiatric report in deciding whether defendant is fit to stand trial is a distinction without a difference, as this very case shows.

¶ 56                           I. PROCEDURAL BACKGROUND

¶ 57 In April 2013, defense counsel sought to have defendant examined by a psychiatrist, because counsel alleged he had a *bona fide* doubt as to defendant's fitness to stand trial. In response, the trial court appointed Dr. Lawrence Jeckel to examine defendant. The following month, Dr. Jeckel opined in a written report provided to the court and counsel that defendant was fit to stand trial.

¶ 58    In August 2013, defense counsel again moved for an examination of defendant for a fitness hearing based on counsel's concern that defendant's mental health had deteriorated. The court ordered a second fitness examination and this time appointed Dr. Albert Lo. In October 2013, Dr. Lo filed his report with the court and each counsel, in which he opined that although defendant was paranoid, he was fit to stand trial.

¶ 59    Shortly before defendant's November 2013 trial, the trial court conducted a hearing on the question of defendant's fitness to stand trial. The court asked defense counsel if he would stipulate that if Dr. Lo were called to testify, he would testify as set forth in his October 2013 report. Counsel responded yes. The prosecutor agreed to the same stipulation, and the court then stated: "We will show based upon the evidence presented, the court finds the defendant is fit to plead and/or stand trial." Despite what the court said, the docket entry for that date states the "[p]arties stipulate to the Dr. Lo finding the defendant FIT to stand trial."

¶ 60                    II. THE NEED FOR "MAGICAL INCANTATIONS"

¶ 61    Based upon *Lewis*, defendant contends that the trial court erred by accepting a stipulation by the parties that, based upon Dr. Lo's report, defendant was fit to stand trial. At oral argument before this court, I asked defense counsel to consider the following hypothetical: Assume that after noting that the parties stipulated that Dr. Lo would testify as indicated in his report regarding defendant's fitness to stand trial, the trial court asked both the prosecutor and defense counsel if either had any additional evidence to present on the issue of defendant's fitness to stand trial, and each indicated he did not. And the court says, "Based upon the evidence before me, I am finding defendant fit." Would that inquiry and statement by the court have satisfied the requirements of *Lewis* and provided due process for defendant? Defense counsel at oral argument conceded that it would but suggested that these additional remarks by the trial court were important, in part, because they reflected "independent judicial analysis." I conclude they are not important and constitute nothing more than a requirement that the court utter "magical incantations" that provide no additional or meaningful protections for defendant.

¶ 62    The record before us makes absolutely clear that the trial court fully understood at the November 2013 fitness hearing that neither the State nor defendant had any *additional* evidence to present on the question of defendant's fitness to stand trial. The sole evidence on point was Dr. Lo's report. In fact, if this case were the extraordinarily unusual one in which either party had some evidence to present beside Dr. Lo's report, either attorney could have spoken up at that hearing to so indicate. Their silence simply reflects what everyone knew: the only evidence on point would be Dr. Lo's report. No "magical incantations" were needed by the court to demonstrate that it knew the ultimate decision regarding defendant's fitness was the court's. Instead, the court's remarks simply moved the proceedings to the next stage–trial–because (1) the court knew no further evidence was going to be presented regarding defendant's fitness to stand trial, and (2) in the absence of any additional or contrary evidence, the court was going to find the defendant fit.

¶ 63    Despite defendant's contention that the parties' stipulation was the only evidence before the trial court regarding defendant's fitness, the court had in fact the opportunity of observing defendant on numerous occasions, and, if the court had any further concerns or doubts about his fitness, it could have (using *Lewis*'s own language) "sought more information" on the subject. Of course, as the *Lewis* court wrote, the ultimate issue of fitness was for the trial court,

not experts, to decide, *but in the absence of any other evidence, the court was going to accept Dr. Lo's report and conclude defendant was fit to stand trial. And the court was correct to do so*.

¶ 64                                      III. THE COSTS OF *LEWIS*

¶ 65        If this court were to reverse defendant's conviction because of the absence of "magical incantations" by the trial court, serious costs would be imposed. The victim in this case, E.B., testified at defendant's November 2013 jury trial that on the day she was sexually assaulted, she was an 18-year-old student at the University of Illinois, majoring in animal science. On that day, she had returned from a spring-break trip to Mississippi, where she had assisted children with disabilities at a therapeutic horse camp. Because the campus dormitory where E.B. lived had yet to reopen, she stayed the night at a friend's apartment.

¶ 66        E.B. testified at trial that she awakened to discover a man she had never before seen trying to get her shorts and underwear off. She succeeded in temporarily stopping his efforts, but he then threw her on the floor and placed his penis on her face as if he was trying to force her to give him oral sex. As a result of her continuing struggle, the man finally ceased his efforts and left.

¶ 67        A later medical exam showed bruising to E.B.'s right upper arm. Semen was on E.B.'s underwear, and DNA extracted from that semen matched defendant.

¶ 68        One can only imagine how difficult and unpleasant it was for E.B. to testify about these traumatic events at defendant's November 2013 jury trial, the result of which he was convicted of attempt (criminal sexual assault) and later sentenced to 30 years in prison. And yet, as bad as it was for E.B. the first time, defendant contends that she should be forced to go through it all again because of *Lewis*. And by the time this case is retried, at least 2½ years will have passed since E.B. last testified, and surely during that time, she has sought to put these terrible events behind her. Yet defendant argues that the supreme court's decision in *Lewis* requires her to have to relive those terrifying moments and again describe them in a courtroom full of strangers–a process like tearing the scab off a healing serious wound, but that is in fact much worse.

¶ 69        And for what?

¶ 70        Because, according to defendant, the trial court did not use "magical incantations" that would have added nothing and provided no additional protections whatsoever to defendant.

¶ 71        Sometimes the costs of questionable legal decisions are hidden, but that is not so regarding *Lewis*. If defendant's argument prevailed, the costs here would be stark and vivid, and if they continue to be inflicted in similar cases in the future, the judiciary has no one to blame but itself.

¶ 72                              IV. DEFENDANT'S DUE PROCESS CLAIM

¶ 73        Defendant contends on appeal that the trial court's failure to use the "magical incantations" discussed earlier in this special concurrence deprived him of due process. I emphatically disagree.

¶ 74        Due process is an important concept, enshrined in our constitution, and part of the bedrock of those essential rights that any defendant charged in a criminal proceeding may embrace to

ensure that he receives a fair trial. Calling the absence of the "magical incantations" at issue in this case a denial of due process demeans and diminishes that important concept.