NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220879-U

NO. 4-22-0879

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 30, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Hancock County |
| MARVIN L. KIRBY, | ) | No. 17CF139 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Rodney G. Clark, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court did not err in denying defendant's motion to withdraw guilty
plea notwithstanding defendant's claims that (a) the court abused its discretion in
finding no *bona fide* doubt of defendant's fitness to plead guilty and (b) plea
counsel was ineffective for failing to investigate defendant's mental state around
the time of his plea and request a fitness examination and hearing.

(2) The decision to order restitution was second-prong plain error where the State
failed to establish defendant's criminal conduct proximately caused the economic
loss at issue.

¶ 2    Defendant, Marvin L. Kirby, who pleaded guilty to seven counts of aggravated

criminal sexual abuse and was sentenced to a total of 70 years' imprisonment, appeals directly

from the trial court's judgment denying his motions to withdraw his guilty plea and reconsider

his sentence.

¶ 3        On appeal, defendant argues (1) the trial court erred in failing to recognize a *bona fide* doubt of his fitness to plead guilty when presented with additional evidence at the hearing on his postsentencing motions or, alternatively, plea counsel was ineffective for failing to investigate his mental health history and request a fitness examination and hearing and (2) the court erred in imposing restitution where the evidence presented at the sentencing hearing did not establish that his criminal conduct proximately caused the economic loss at issue or, alternatively, counsel was ineffective for failing to preserve the issue for appellate review. We affirm in part, reverse in part, and remand with directions.

¶ 4                                I. BACKGROUND

¶ 5                         A. The Charges and Guilty Plea

¶ 6        On November 6, 2017, the State charged defendant with one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2016)). Counsel was appointed to represent defendant the following day. The State filed its discovery disclosure on December 11, 2017. On December 12, 2017, the State charged defendant by way of a second amended information with seven counts of aggravated criminal sexual abuse (*id.*), alleging in each count that between July 1, 2017, and October 24, 2017, defendant, who was 17 years of age or older, committed an act of sexual penetration on A.M.M. (born in November 2001) by placing his penis in her vagina.

¶ 7        On December 12, 2017, the same day the State filed its second amended information, defendant pleaded guilty to all counts after expressing his desire to plead guilty to the trial court. At the hearing, he informed the court that he had "been able to read everything" shown to him by counsel and he had no questions about what he had reviewed. Defendant stated the only questions he had had prior to the hearing were answered by counsel, and he was satisfied with the answers provided to him. Defendant indicated to the court that he was not

- 2 -

under the influence of alcohol or drugs, did not take any medication that would interfere with his ability to understand the proceedings, and was "of clear mind." The court admonished defendant as to each of the charges against him, the potential sentences, and his rights.

¶ 8        As a factual basis for the plea, the State indicated it would be able to produce certified copies of defendant's and A.M.M.'s birth certificates showing defendant was 36 years old during the relevant time and A.M.M. was 15 years old during the relevant time. Members of the Hancock County Sheriff's Office would testify to responding to A.M.M.'s suicide on October 24, 2017, and subsequently executing search warrants for defendant's residence, the victim's residence, and cell phones located at both. The State would also introduce a recorded interview between Hancock County Sheriff Scott Bentzinger and defendant, during which defendant admitted he had had "an ongoing sexual relationship with A.M.M. and had sexually penetrated her vagina with his penis on at least seven different occasions." Letters and text messages between defendant and A.M.M. would verify a sexual relationship, and at least three witnesses would testify to knowing about the relationship. Lastly, the State would introduce lab reports indicating A.M.M.'s deoxyribonucleic acid (DNA) had been discovered on defendant's mattress and both defendant's and A.M.M.'s DNA had been discovered on a condom located in defendant's residence. The trial court found the factual basis sufficient and accepted defendant's pleas as knowing and voluntary.

¶ 9                              B. The Sentencing Hearing

¶ 10        On January 19, 2018, the trial court conducted a sentencing hearing. The State called four witnesses and introduced several exhibits into evidence. Defendant did not present any evidence.

¶ 11        The State first called Joshua Smith, a deputy with the Hancock County Sheriff's Office. Smith testified that on October 24, 2017, he responded to a call at A.M.M.'s residence of "a female juvenile with a gunshot wound to the head." Upon arriving at the residence, Smith discovered A.M.M. "deceased in her bedroom in the basement." Smith recovered several pieces of evidence from the residence, including a firearm and several handwritten letters written by A.M.M. and another individual, later discovered to be defendant. Smith identified, over defendant's objection, People's exhibit Nos. 4, 5, and 6, which he indicated were, respectively, a "suicide note" written by A.M.M. and two separate letters written by defendant. The letters were discovered in A.M.M.'s bedroom. Smith testified officers subsequently located defendant at A.M.M.'s gravesite with a letter written to him by her, which he identified as People's exhibit No. 3. The trial court admitted each of the exhibits into evidence over defendant's objection. Smith further testified that during the course of the investigation, police learned that defendant first met A.M.M. when he was hired by her mother and stepfather to remodel their living and dining rooms.

¶ 12        In People's exhibit No. 3, A.M.M. wrote about her love for defendant. She stated, "I woke up this morning laying beside you and for a moment I forgot all about the bad things in our lives and all limitations." Later in the letter, she wrote, "I fell asleep picturing you hanging in your closet. I've felt like I have been stuck in a world that doesn't exist ever sense [*sic*]. Never feeling too bad or too good, just numb."

¶ 13        In People's exhibit No. 4, the "suicide note," A.M.M. wrote the following in pertinent part:

> "This first part is for Josh [(A.M.M.'s stepfather)] and my mom. Mom I know
> you're not a bad person and in some way I liked you until…Josh. Yea, at first he

was cool and fun but when you married him his true colors were shone [*sic*]. I'm not sure if you know but I can hear you when you talk bad about me in your room or on the porch or anywhere inside really. It hurts my feeling[s] to know that you feel those things towards me and you think its funny. Now Josh, you have the potential to be a good guy just stop being yourself. You are a two faced jerk and when I am gone don't pretend you're not, accept it. You lie to me you make fun of me, you do nothing but make me hate you and my life."

Later in the note, A.M.M. wrote, "No one could have stopped this so only Josh should feel bad. BTW [(by the way)] its [*sic*] not cuz [*sic*] of the lectures[,] you're just an awful person." A.M.M. also dedicated a portion of her note to a "special someone" she did not identify:

"I love you. I messed up. I hate myself for it. I don't deserve you I really don't, you're an amazing person and I am nothing but a common whore. *** I only did what I did because I thought I was doing the best thing for everyone because I had already convinced myself you didn't love me and that whores [*sic*] actions don't matter. I was also scared. I'm sorry for hurting you. You shouldn't feel anything when I am gone I never really mattered anyways. I see that I was wrong to do what I did and I stopped completely. *** I also want you to know you were always first, you were never the second priority. I never loved Brandon I was just scared he would kill himself and it would be on me. *** Yes, I deserved feeling like shit, even when you would rub it in my face."

¶ 14      In People's exhibit No. 6, defendant wrote to A.M.M., "I promise you I'll be the guy you fell in love with and I'll make Josh stop treating you so bad and I'll keep you happy so you never cut yourself again."

¶ 15 Scott Bentzinger, the Hancock County sheriff, testified that he interviewed defendant on two separate occasions. During those interviews, defendant "admit[ted] to a sexual relationship with A.M.M. on at least seven different occasions." Defendant informed Bentzinger that "they were together every night except for the time that she was in the hospital for approximately a week." Bentzinger testified that based on his office's investigation, including speaking with A.M.M.'s mother and stepfather, "A.M.M. had never received any mental health treatment prior to her relationship with [defendant]."

¶ 16 Carla Bishop, defendant's probation officer from a separate case, testified that she prepared a presentence investigation report (PSI) in advance of the sentencing hearing. According to the PSI, defendant was convicted of aggravated criminal sexual abuse in Hancock County case No. 16-CF-37 and sentenced to probation. As a condition of his probation, he was prohibited from "gain[ing] employment that provided him with access to children under age 18." Defendant reported that he met A.M.M. while remodeling her parents' home. He "began sleeping in A.M.M.'s bed with her at night to protect her in case [her stepfather] came into her room to touch her." Defendant knew A.M.M. had been "hospitalized in an adolescent psychiatric unit" in October 2017. Defendant reported contemplating suicide when he discovered A.M.M. "was talking to *** an 18 year old named Brandon." On October 18, 2017, defendant "went into his closet and wrapped a rope around his neck because he was having problems in all areas of his life." A.M.M. went to defendant's house and discovered him in the closet with a rope around his neck. Defendant reported that he "lost concern for everything" following A.M.M.'s death and felt "extreme grief" and depression. On November 1, 2017, defendant intended to kill himself at A.M.M.'s gravesite, but police intervened and prevented him from doing so. Defendant was involuntarily admitted to Blessing Hospital as a result of this incident. He reported attempting

suicide multiple times while hospitalized. Records from the hospital showed defendant was discharged on November 6, 2017, and his "diagnoses included Major Depressive Disorder, Severe, Recurrent, Without Psychiatric Features and, Personality Disorder." The PSI also indicated A.M.M.'s mother was requesting $2779.46 in restitution for (1) the cost of being transported by ambulance to the hospital after she passed out upon discovering A.M.M.'s body and (2) property damage resulting from A.M.M. shooting herself with a firearm in her home. A.M.M.'s mother provided an invoice from Hancock County Ambulance and a State Farm summary of loss invoice providing the amounts she had paid. No additional request for restitution was contained in the PSI.

¶ 17        Ian Ballas testified that on October 23, 2017, the day before A.M.M. died by suicide, he was driving home and saw defendant and a "little girl" standing on the sidewalk having an argument. Ballas said the girl looked upset and may have been crying. Ballas saw pictures of A.M.M. after her death and realized that she was the girl he had seen on October 23. He reported the incident to authorities once he made the connection.

¶ 18        A.M.M.'s mother and stepfather prepared victim-impact statements and read them to the trial court. Her stepfather, Josh, stated a loving "father/daughter" bond existed between them. He stated A.M.M. "had been struggling in her day-to-day life" leading up to her death. Josh and her mother knew A.M.M. needed help and they "used every possible form of help" to get her through what they believed to be "regular teenage problems. As it turns out, we were completely wrong. [Defendant] robbed an innocent girl of her sanctity. He preyed upon her much like an animal preys upon its next meal. [Defendant] twisted her mind to suit his own nasty and perverted desires, all the while mentally and emotionally wasting [A.M.M.]"

¶ 19        A.M.M.'s mother, Christina, stated A.M.M.'s personality began to change once they completed the remodeling project. "She was starting to fail some of her classes and dropped out of cheerleading. *** The once sweet and hilarious daughter, full of life, was becoming rapidly withdrawn and easily brought to tears." A.M.M. "kept saying things like 'I'm a terrible daughter; I'm worthless,' " so they took her to Blessing Hospital. At the hospital, "she admitted to cutting herself and feeling worthless." A.M.M. was prescribed Lexapro and discharged from the hospital after one week. Christina stated A.M.M. appeared to be doing better at home for some time, until "our contractor entered the picture again to discuss new projects."

¶ 20        Following the recommendations of the parties, the trial court sentenced defendant to 10 years' imprisonment on each count, with the sentences to be served consecutively, for a total of 70 years' imprisonment. The court then asked the State if restitution had been requested, and the State informed the court that, in addition to the $2779.46 listed in the PSI, A.M.M.'s parents were also requesting "$11,000 in lost wages," for a total of $13,779.46. The court granted the request and imposed restitution in the amount noted.

¶ 21                    C. The Initial Motions to Withdraw
                        Guilty Plea and Reconsider Sentence

¶ 22        On February 1, 2018, defendant *pro se* filed a motion to withdraw guilty plea, in which he alleged he received "inadequate representation by counsel" and that he "was not mentally competent to enter a plea [because he] was going through serious mental health issues at the time of [the] plea and was just released from [a] mental hospital." Counsel was appointed to assist defendant with his motion. Defendant did not file a motion to reconsider sentence within 30 days of being sentenced. In July 2018, defendant, through appointed postplea counsel, filed an amended motion to withdraw guilty plea and a motion to reconsider sentence, both of which the trial court denied. Defendant appealed, and, in July 2021, the appellate court entered an order

- 8 -

reversing the court's judgment in part and remanding for further proceedings due to counsel's failure to strictly comply with Illinois Supreme Court Rule 604(d) (eff. July 1, 2017). See *People v. Kirby*, 2021 IL App (3d) 190466-U.

¶ 23                    D. The Instant Motions to Withdraw
                       Guilty Plea and Reconsider Sentence

¶ 24                              1. *The Motions*

¶ 25         On remand, defendant filed what he titled as a second amended motion to withdraw guilty plea and a second amended motion to reconsider sentence. In the motion to withdraw guilty plea, defendant argued he "did not have the benefit of effective counsel at the time the pleas *** were made." He alleged, in relevant part, "initial counsel did not request or inspect the medical records of *** defendant or raise the issue of his diminished capacity in relation to the statements made by *** defendant or make any attempt to suppress the same." Defendant summarized his ineffective-assistance claim as follows:

> "It is the position of present counsel for the defendant that the original
>
> counsel's contact of less than one hour with the defendant outside of court, prior
>
> to the plea, the fact that the plea was entered a day after discovery being produced
>
> and with no opportunity to review the same with the client, the inaccurate
>
> representations made to the client by counsel as to the possible sentence, the
>
> complete lack of investigation into the client's mental state despite his recent
>
> release for psychiatric treatment, the lack of any discussion regarding potential
>
> defenses or any corroboration necessary regarding confessions, and finally the
>
> fact that the [PSI] was available for a week and only reviewed with the defendant,
>
> if at all, the night prior to sentencing, when taken in total constitute a
>
> [*prima facie*] case of ineffective assistance of counsel."

In the motion to reconsider sentence, defendant argued, in pertinent part, the trial court erred in imposing restitution where there was no evidence his criminal conduct proximately caused the economic loss at issue.

¶ 26 Defendant attached several documents to his motions, including a "Patient Education" form from Blessing Hospital outlining various aspects of major depressive disorder, such as its symptoms, how it is diagnosed, and effective treatments. The form included defendant's medical records identification number and indicated he was admitted to the hospital on November 1, 2017, and discharged on November 6, 2017. According to the educational form, major depressive disorder is a mental illness that "causes feelings of sadness, hopelessness, or helplessness." It is often trigged by "stressful life events," such as "the death of a family member or close friend." It usually includes the following symptoms: (1) a lack of energy or motivation, (2) feelings of guilt and worthlessness, (3) difficulty concentrating, remembering, or making decisions, and (4) recurrent wishes for death or suicidal ideation. Defendant also attached jail logs showing plea counsel met with him for 30 minutes on December 5, 2017, and again on December 8, 2017, along with three other clients, for a total of 25 minutes.

¶ 27 The State filed a response to defendant's motions. In relevant part, the State argued the trial court should "disregard any argument and dismiss any reference to [the] Motion to Reconsider Sentence" because he failed to challenge his sentence within 30 days of its imposition. The State also argued that the "suggestion that *** defendant had limited mental capacity" was not sufficient to raise a *bona fide* doubt of his fitness and that the record demonstrated defendant was able to participate in his own defense by "communicating and conferring" with plea counsel.

¶ 28                                    2. *The Hearing*

¶ 29            On September 26, 2022, the trial court conducted a hearing on defendant's motions. Defendant and plea counsel were the only witnesses to testify.

¶ 30            Defendant testified that shortly before being arrested in this case, he had been involuntarily hospitalized at Blessing Hospital for approximately one week due to a suicide attempt. His attending physicians prescribed him psychotropic medication, although he refused to take it. Defendant testified his only focus while in the hospital was committing suicide. He stated he lied to his doctors about his mental state to secure his release from the hospital. Defendant was taken into custody immediately after being released from the hospital, and his suicidal ideation continued while in custody. Plea counsel was appointed to represent defendant the day after his arrest. He testified counsel never asked him about his mental state or his competency to stand trial, his recent hospitalization, or whether he was taking any psychotropic medications. Defendant also testified that counsel never showed him any of the discovery materials or discussed potential trial strategies with him. According to defendant, plea counsel told him that the maximum sentence he "could possibly get by law" was 20 years' imprisonment, served at 50%. Defendant testified that at the time he entered his guilty plea, his main concern remained committing suicide, he was "having trouble comprehending things going on around" him, and he was "dealing with a lot."

¶ 31            Plea counsel testified he could not recall if he knew at the time of his appointment to this case that defendant had recently been released from the hospital. He also could not recall if he requested any of defendant's medical records. Plea counsel explained that if defendant had been admitted to and subsequently released from the hospital, he "wouldn't have anything to say that the person has any problems if they've released him." He further explained it would not have been helpful to look at defendant's medical records given what he "was hearing regarding

- 11 -

the evidence that they had." Plea counsel testified that although discovery was not formally filed until the day before defendant entered his plea, the prosecutor had given him some of the discovery materials prior to that date. Plea counsel attempted to review the materials with defendant, but defendant "pushed it away" and "said he did not want to see it." According to counsel, defendant "wanted to get it over with. He was very fatalistic because the girl involved had committed suicide and he kept saying it was his fault and he *** needed to plead guilty." When asked if there was anything to suggest defendant "didn't understand what he was doing in processing the information," plea counsel answered, "My impressions of him were that he knew exactly what he was doing whenever he did it. There wasn't anything that he said to lead me to believe that he had any mental failing in this." Plea counsel later testified defendant was "acting despondent," so he "had to have the jail put him on a suicide watch, but he didn't convey to me any mental health problems."

¶ 32    During its argument, the State conceded that the $11,000 portion of the restitution award for lost wages was improper because it was not supported by any evidence. Following the arguments of the parties, the trial court issued its findings and ruled that defendant had failed to establish plea counsel was ineffective. The court found plea counsel to be credible and accepted his version of the events, noting defendant "has already admitted he lied to the hospital, possibly he's lying to the Court." The court also noted, "Today we still don't have any indication that [defendant] was suffering from some kind of mental illness. There's no records put forth. And he's saying, 'Oh, I would've brought all these witnesses.' But not one listed, not any indication to this Court as to what that would've walked like and talked like." In the court's view, "Defendant fully understood what he was confessing to, and he was hoping to get a lighter sentence." The court further found as follows:

"[THE COURT:] This court saw [defendant]. Not only did I have [defendant], I was the trial judge in the first trial, but I went through this with him. I was able to see his mannerism; I was able to see his demeanor. There was no indication to this Court that he was suffering from any kind of mental problems or was uncomfortable in any way with his plea. And I can tell you that I look at defendants, and I look to make sure they're comfortable. Matter of fact, history could show that I have stopped proceedings because I don't feel that a defendant is comfortable. And I stop the proceedings and we go about it a different way.

He said he was satisfied with his counsel, but all of a sudden now he's not. He was satisfied with his counsel because [defendant] wanted to plead guilty, because he was guilty. He just didn't like the sentence. I can't say that enough."

With respect to restitution, the court stated, "The evidence at the sentencing hearing, it was relevant, it was reliable, and the Court did not hold [defendant] specifically responsible for the minor's passing but it was something that was relevant." The court accepted the State's concession with respect to the $11,000 for lost wages and vacated that portion of the restitution award but otherwise denied defendant's motions.

¶ 33       This appeal followed.

¶ 34                                II. ANALYSIS

¶ 35       On appeal, defendant argues (1) the trial court erred in failing to find a *bona fide* doubt of his fitness to plead guilty when presented with additional evidence at the hearing on his postsentencing motions or, alternatively, plea counsel was ineffective for failing to investigate his mental state and request a fitness hearing and (2) the court erred in imposing restitution where the evidence presented at the sentencing hearing did not establish that his criminal conduct

proximately caused the economic loss at issue or, alternatively, counsel was ineffective for failing to preserve the issue for appellate review.

¶ 36                                    A. Fitness

¶ 37          First, defendant argues the trial court erred in failing to find a *bona fide* doubt of his fitness at the time of his guilty plea when presented with additional evidence at the hearing on his postsentencing motions because "the record developed below establishes *** [he] was not competent to assist in his defense due to his mental condition." Specifically, he contends the evidence presented—*i.e.*, plea counsel's testimony at the hearing, the information contained in the PSI, and the Blessing Hospital educational form attached to his motion—establishes his major depressive disorder manifested itself around the time of his plea, as demonstrated in his irrational demand to plead guilty without first reviewing the State's evidence against him or considering possible defenses. Alternatively, defendant argues plea counsel rendered ineffective assistance "by failing to investigate [his] mental-health history, raise the issue of a *bona fide* doubt of [his] fitness, and request both a fitness examination and fitness hearing."

¶ 38          "Due process bars prosecuting or sentencing a defendant who is not competent to stand trial." *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). "Although a defendant's fitness is presumed by statute [citation], the [trial] court has a duty to order a fitness hearing, *sua sponte*, any time a *bona fide* doubt arises regarding a defendant's ability to understand the nature and purpose of the proceedings or assist in his defense." *Id.*; see *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 32 ("A defendant is *unfit* only if, because of a mental or physical condition, he is unable to understand the nature of the proceedings against him or to assist in his defense." (Emphasis in original.)); *People v. Tapscott*, 386 Ill. App. 3d 1064, 1075 (2008) ("The competency standard to plead guilty or stand trial is the same, *i.e.*, the defendant must understand

the nature of the charge and purpose of the proceedings and be able to assist in his defense.").
"Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. [Citation.] A person can be fit for trial although his mind may be otherwise unsound." *People v. Coleman*, 168 Ill. 2d 509, 524 (1995). "Factors that are relevant for the trial court to consider in assessing the existence of a *bona fide* doubt of the defendant's fitness include (1) the rationality of the defendant's behavior and demeanor at trial and (2) any prior medical opinions on the issue of the defendant's fitness." *Tapscott*, 386 Ill. App. 3d at 1075-76. "Further, defense counsel's representations concerning his client's competency, while not conclusive, are another important factor to consider." *Id.* at 1076.

¶ 39 Whether a *bona fide* doubt of a defendant's fitness exists is a matter within the trial court's discretion. *Sandham*, 174 Ill. 2d at 382. "Where no fitness hearing was held, we will reverse a conviction and remand *** only where the trial court abused its discretion in failing to act on a *bona fide* doubt of the defendant's fitness." *Nichols*, 2012 IL App (4th) 110519, ¶ 31. "A trial court abuses its discretion only when its ruling is arbitrary, fanciful or unreasonable or where no reasonable man would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Santos*, 211 Ill. 2d 395, 401 (2004). "In evaluating the trial court's exercise of its discretion, we will keep in mind that the trial court is in a superior position to view the defendant's behavior firsthand and to determine based on its observation whether the requisite doubt exists." *Nichols*, 2012 IL App (4th) 110519 ¶ 31.

¶ 40 In their briefs, the parties cite *Sandham* and *Nichols*. In *Sandham*, our supreme court held that the trial court had abused its discretion by failing to rule that the following events and testimony combined to raise a *bona fide* doubt of the defendant's fitness to stand trial or be sentenced:

"(1) the public defender's oral motion, which the trial court granted, to obtain a psychiatric evaluation to determine defendant's fitness; (2) the continuance of the trial due to defendant's inability to cooperate with defense counsel except with difficulty and the defendant's ensuing commitment to a psychiatric ward; (3) defendant's two letters to the court which were complimentary and exceedingly hostile, respectively, and which spoke of defendant beginning his 'real life' after sentencing; (4) defendant's threatening phone calls to the trial judge; (5) the testimony of complainant's mother that defendant was not 'all the way there' and would sometimes run outside and start praying loudly to God; (6) the Pfeiffer Center evaluation testimony which suggested that defendant had a slight chemical imbalance and was slightly schizophrenic; (7) defendant's ingestion of psychotropic medications at or about the time of trial and/or sentencing; and (8) defendant's irrational outbursts during the sentencing hearing regarding his brain being cut out, his conversation with his mother, his 'top of the charts' albums and his comic books." *Sandham*, 174 Ill. 2d at 388.

The supreme court further "observe[d] that the trial judge himself appear[ed] to have recognized a *bona fide* doubt regarding [the] defendant's fitness when he stated that [the] defendant 'did not even seem to understand what's going on' and 'whether you understand what I am saying or not I am not sure.' " *Id.* at 389. The *Sandham* court concluded that although a *bona fide* doubt likely existed before the trial judge made his observations, "there [wa]s no question that the trial judge had no discretion and was required to conduct, *sua sponte*, a fitness hearing at the point he questioned [the] defendant's capacity to comprehend what was transpiring at the sentencing hearing." *Id.*

¶ 41        In *Nichols*, this court rejected the defendant's argument that "the trial court erred by not ordering a fitness hearing on its own motion in response to allegedly incoherent and delusional statements [the] defendant made and his treatment during [the] proceedings for schizophrenia." *Nichols*, 2012 IL App (4th) 110519, ¶ 2. The record in *Nichols* established the defendant had been diagnosed with schizophrenia, was prescribed psychotropic medication, and had been housed in the prison's mental health unit throughout the proceedings. *Id.* ¶ 23. According to a "mental health diagnostic and treatment note" prepared around the time of his trial, the defendant's "thought process [was] at times loose, at time[s] making statements like 'London family.' " *Id.* The note also indicated the possibility of auditory hallucinations and that his insight and judgment were poor. *Id.* Nonetheless, the defendant chose to represent himself at his jury trial. *Id.* ¶ 6. At one point during the trial, when the defendant was requesting the court to admit evidence of prior bad acts committed by the State's key witness, the court reporter interrupted and "stated, 'I am not understanding him.' " *Id.* ¶ 18. In response, the "court remarked, 'I will show the defendant is not making much sense here.' " *Id.*

¶ 42        On appeal, we concluded that, "notwithstanding some evidence suggesting he was being held in the prison's mental health unit and treated for schizophrenia, no *bona fide* doubt of [the] defendant's fitness *** arose during these proceedings." *Id.* ¶ 38. In support of our conclusion, we reasoned that despite the evidence he was being treated for schizophrenia at the time of his trial, "nothing we perceive indicates that defendant's schizophrenia manifested during trial or sentencing or impaired [his] capacity for understanding the nature of the proceedings against him or his ability to present his defense." *Id.* ¶ 33. Further, we found the defendant's "statements and allegations [we]re not so plainly delusional and grandiose that, evaluating [the trial court's] exercise of discretion against a cold record, we would conclude the court erred in

not ordering a fitness hearing." *Id.* ¶ 36. Finally, the *Nichols* court distinguished the facts before it from those in *Sandham*, noting that unlike in the latter case, "the trial court never questioned whether defendant was consciously engaged in his trial and sentencing," and the defendant "made no comments indicating that he was unaware of the nature of the ongoing proceedings." *Id.* ¶ 38.

¶ 43            Here, in support of his argument that he was unable to assist in his defense due to his mental state, defendant highlights plea counsel's testimony at the hearing, which he contends was corroborated by the information in the PSI, and the Blessing Hospital educational form he attached to his motion to withdraw guilty plea. Specifically, plea counsel described defendant as being "very fatalistic" and "despondent" and stated he was "demanding" to plead guilty "from the onset." Plea counsel testified defendant refused to review discovery with him. Because defendant appeared so despondent, plea counsel requested that the jail place him on a suicide watch. According to the PSI, defendant intended to die by suicide at A.M.M.'s gravesite on November 1, 2017, but was unsuccessful due to police intervention. He was involuntarily admitted to the psychiatric unit at Blessing Hospital, where he again attempted suicide multiple times. "His diagnoses included Major Depressive Disorder, Severe, Recurrent, Without Psychiatric Features and, Personality Disorder." According to the Blessing Hospital educational form, major depressive disorder is a mental illness that "causes feelings of sadness, hopelessness, or helplessness." It is often trigged by "stressful life events" such as "the death of a family member or close friend." It usually includes the following symptoms: (1) a lack of energy or motivation, (2) feelings of guilt and worthlessness, (3) difficulty concentrating, remembering, or making decisions, and (4) recurrent wishes for death or suicidal ideation.

¶ 44   We find the evidence defendant cites does not establish the trial court abused its discretion in finding no *bona fide* doubt of his fitness to plead guilty. The facts in this case are closer to those in *Nichols* and distinguishable from those in *Sandham*. In both *Nichols* and the instant case, the defendant presented some evidence of a mental illness, but not enough evidence to suggest unfitness. See *Nichols*, 2012 IL App (4th) 110519, ¶ 33 ("[N]othing we perceive indicates that defendant's schizophrenia manifested during trial or sentencing or impaired defendant's capacity for understanding the nature of the proceedings against him or his ability to present his defense.").

¶ 45   Here, defendant argues plea counsel's testimony demonstrates he "was so overcome with feelings of grief, guilt, and helplessness that he had no motivation or ability to assist in his defense." Although defendant did present evidence showing he experienced feelings of grief, guilt, and helplessness around the time of his plea, he failed to demonstrate those feelings rendered him *unable*, as opposed to unwilling, to assist in his defense. For example, defendant presented no evidence he was unable to communicate with plea counsel or understand what he was being told. In fact, defendant informed the court prior to entering his plea that "[t]he only questions that I've had for [plea counsel] he had answered during a visit at the jail." Plea counsel testified it was his impression "that [defendant] knew exactly what he was doing whenever he did it. There wasn't anything that he said to lead me to believe that he had any mental failing in this." The fact that defendant felt grief and insisted on pleading guilty without reviewing discovery does not necessarily mean he was acting irrationally. To the contrary, a rational person would almost certainly feel grief if they believed their actions had caused a loved one to die by suicide. A rational person might also choose to accept responsibility for their

actions in such a situation rather than endure a trial that would prolong their exposure to the source of their despair.

¶ 46    In short, notwithstanding defendant's expression of "feelings of grief, guilt, and helplessness" around the time of his plea, he has failed to show the trial court abused its discretion in finding no *bona fide* doubt of his fitness. See *Coleman*, 168 Ill. 2d at 524 ("Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. [Citation.] A person can be fit for trial although his mind may be otherwise unsound."); see also *People v. Sanchez*, 169 Ill. 2d 472, 484 (1996) ("[E]vidence documenting the defendant's suicide attempt does not show that the defendant's capacity to understand the proceedings or to assist in his own defense was diminished or impaired at the time of the sentencing hearing.").

¶ 47    As noted above, plea counsel testified that he believed defendant "knew exactly what he was doing whenever he did it" and never said anything to make counsel think "he had any mental failing in this." See *Tapscott*, 386 Ill. App. 3d at 1076. ("[D]efense counsel's representations concerning his client's competency, while not conclusive, are another important factor to consider."). Additionally, the trial court never expressed any uncertainty regarding defendant's fitness. In fact, the court noted it had presided over defendant's previous trial and had carefully observed his "mannerism[s]" in the instant proceedings, and it found "[t]here was no indication *** that he was suffering from any kind of mental problems or was uncomfortable in any way with his plea." See *Santos*, 211 Ill. 2d at 401 ("In evaluating the trial court's exercise of its discretion, we will keep in mind that the trial court is in a superior position to view the defendant's behavior firsthand and to determine based on its observation whether the requisite doubt exists."). Given the trial court's superior position to evaluate defendant's behavior,

coupled with this court's deferential standard of review, we cannot say it was unreasonable for the court to find no *bona fide* doubt of defendant's fitness to plead guilty. *Nichols*, 2012 IL App (4th) 110519 ¶ 31.

¶ 48 As previously noted, defendant argues in the alternative that plea counsel rendered ineffective assistance "by failing to investigate [his] mental-health history, raise the issue of a *bona fide* doubt of [his] fitness, and request both a fitness examination and fitness hearing." This court reviews ineffective-assistance claims *de novo*. *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88.

¶ 49 "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). A claim of ineffective assistance is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*). Under *Strickland*, "a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."(Internal quotation marks omitted.) *Id.* "To establish that the failure to request a fitness hearing prejudiced a defendant within the meaning of *Strickland*, a defendant must show that facts existed at the time of trial that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings against him or to assist in his defense." (Internal quotation marks omitted.) *People v. Harris*, 206 Ill. 2d 293, 304 (2002).

"Defendant is entitled to relief *** only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered." *People v. Easley*, 192 Ill. 2d 307, 319 (2000).

¶ 50　　　　　Here, with respect to the prejudice prong, defendant argues that "if a *bona fide* doubt existed at the time of [his] plea, [he] was prejudiced by [plea counsel's] failure to raise it, even if the record illustrates that the circuit court erroneously believed on remand that a *bona fide* doubt as to [his] fitness did not exist at the time of the plea." However, as discussed above, the trial court did not err in finding no *bona fide* doubt of defendant's fitness existed, and he is unable to establish prejudice as a result. Accordingly, we reject his ineffective-assistance claim. See *People v. Simpson*, 2015 IL 116512, ¶ 35 ("A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness.").

¶ 51　　　　　　　　　　　　　　B. Restitution

¶ 52　　　　　Next, defendant argues the trial court erred in imposing restitution because the evidence presented at the sentencing hearing did not establish that his criminal conduct proximately caused the economic loss at issue. Specifically, while conceding the damages at issue were caused by A.M.M.'s suicide, he contends they were "not of a type that a reasonable person would foresee as being the likely result of A.M.M. merely having sex with defendant." He also asserts the court erred in finding proximate causation "[b]ecause the record does not establish why A.M.M. chose to commit suicide, let alone that she did so because she had sex with defendant." Defendant acknowledges that he forfeited this argument by failing to include it in a timely motion to reconsider sentence but nonetheless asks this court to review it under the second prong of the plain-error doctrine. Alternatively, he contends counsel was ineffective for

failing to include the issue in a timely motion to reconsider sentence and preserve it for appellate review.

¶ 53　　　　Under the plain-error doctrine, we may consider an unpreserved error where, in relevant part, "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Birge*, 2021 IL 125644, ¶ 24. The defendant bears the burden of persuasion under either prong of the doctrine. *Id.* Generally, the first step of plain-error review requires this court to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. Thus, in this instance, we must determine whether the trial court committed a clear or obvious error in finding defendant's criminal conduct proximately caused the economic loss at issue—*i.e.*, (1) the ambulance bill and (2) the cost to repair the property damage caused by A.M.M.'s discharge of a firearm.

¶ 54　　　　Section 5-5-6 of the Code of Corrections (730 ILCS 5/5-5-6 (West 2016)) provides that in "all convictions for offenses in violation of *** the Criminal Code of 2012 *** in which the person received any injury to his or her person or damage to his or her real or personal property as a result of the criminal act of the defendant, the court shall order restitution." Subsection (b) of section 5-5-6 explains how the trial court is to fix the amount of restitution to be paid: "the court shall assess the actual out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and any other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of the defendant." *Id.* § 5-5-6(b). We will not reverse a restitution order absent an abuse of discretion. *People v. Clausell*, 385 Ill. App. 3d 1079, 1080 (2008).

¶ 55 "[T]he principal of proximate cause applies to both [civil and criminal] cases. Causal relation is the universal factor common to all legal liability." (Internal quotation marks omitted.) *People v. Hudson*, 222 Ill. 2d 392, 401 (2006). "The term 'proximate cause' describes two distinct requirements: cause in fact and legal cause." *Id.* " 'Cause in fact' is established where there is reasonable certainty that the injury would not have occurred 'but for' the defendant's conduct or where a defendant's conduct was a 'substantial factor' in bringing about the harm." *Stanphill v. Ortberg*, 2018 IL 122974, ¶ 34. Legal cause, on the other hand, involves a question of foreseeability. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 24. "Courts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Id.* "The question is one of policy—How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004).

¶ 56 Here, we agree with defendant that clear error occurred as a result of the trial court finding defendant's criminal conduct proximately caused the economic loss at issue. In its argument, the State asserts defendant "engaged in a pattern of systemic [*sic*] mental and sexual abuse over the course of months against A.M.M." and "engaged in a horrific pattern of manipulation so that he could achieve his abusive desires." For example, the State points to the fact that A.M.M. discovered defendant with a noose around his neck just days before she died by suicide. The State further highlights that "A.M.M. spent much of her suicide letter to defendant belittling herself and apologizing for what she did with Brandon." Essentially, the State argues we should consider the *entirety* of defendant's relationship with A.M.M., and not just the unlawful sexual contact, to conclude that defendant's conduct was likely to result in A.M.M.

dying by suicide. However, this conduct referenced by the State was not part of the criminal act for which defendant was convicted. Importantly, in assessing whether restitution is proper, a court may only consider a defendant's criminal conduct for which he was convicted. See 730 ILCS 5/5-5-6(b) (West 2016).

¶ 57　　　　The criminal conduct for which defendant was convicted consisted of "knowingly committ[ing] an act of sexual penetration on a minor, *** who at the time of the offense was at least 13 years of age but under 17 years of age," by "plac[ing] his penis inside the vagina of A.M.M." See 720 ILCS 5/11-1.60(d) (West 2016). This is the only conduct we may consider in determining whether the restitution ordered by the trial court was proper. The State has failed to cite any authority holding that unlawful sexual contact by a defendant may be considered the proximate cause of a victim's subsequent suicide. Indeed, in the civil realm, the general rule is that "suicide is unforeseeable as a matter of law" and "the plaintiff bears a heavy burden of pleading and proving facts that would overcome application of the rule." *Turcios*, 2015 IL 117962, ¶ 31. Here, the State did not meet its burden of proving proximate cause. Accordingly, we find the court committed second-prong plain error in finding defendant's criminal conduct proximately caused the economic loss at issue, and we remand with directions that the court vacate the restitution award. See, *e.g.*, *People v. McCormick*, 332 Ill. App. 3d 491, 499 (2002) (vacating improper restitution order under the second prong of the plain-error doctrine).

¶ 58　　　　　　　　　　　　　　III. CONCLUSION

¶ 59　　　　For the reasons stated, we affirm the trial court's judgment in part, reverse it in part, and remand with directions.

¶ 60　　　　Affirmed in part and reversed in part; cause remanded with directions.